## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE SHARON LEE WEST,<br>    Debtor. | )<br>)<br>) **Case No. 16-40358-can7**<br>) |
| | ) |
| RANDY AND SHERRI' JAMES,<br>     Plaintiffs, | )<br>)<br>)<br>) **Adv. No. 16-04083-can** |
| v. | )<br>) |
| SHARON LEE WEST,<br>     Defendant. | )<br>)<br>) |

## MEMORANDUM OPINION AND ORDER DENYING AMENDED MOTION TO DISMISS OR CONVERT AND ENTERING JUDGMENT FOR DEFENDANT ON PLAINTIFFS' COMPLAINT FOR NONDISCHARGEABILITY

This matter is before the Court on two matters consolidated for discovery and hearing by agreement of the parties and the Order of the Court: (1) the Amended Motion of Randy and Sherri' James to dismiss or convert the Debtor Sharon West's Chapter 7 case under 11 U.S.C. §§ 707 and 706 and the objection of the Debtor thereto, and (2) the Jameses' complaint pursuant to 11 U.S.C. § 523 to determine dischargeability of their debt.

The Court, having reviewed the Amended Motion, objection, complaint and answer; having heard statements and arguments of counsel; having considered the demeanor and credibility of the witnesses; and having considered the evidence introduced at the hearing, makes the following Findings of Fact[1] and Conclusions of Law:

---

[1] In this opinion the Court refers to matters in the Court's record. "It is generally accepted that a bankruptcy judge may take judicial notice of the bankruptcy court's records pursuant to Federal Rule of Evidence 201." *In re Tessier*, 333 B.R. 174, 175 n.1 (Bankr. D. Conn. 2005) (citing BARRY RUSSELL, BANKRUPTCY EVIDENCE MANUAL, § 201.5 (2005 ed.)).

*Jurisdiction*

The motion to dismiss or convert under 11 U.S.C. §§ 706 and 707 is a contested matter governed by Rule 9014. The § 523 complaint is an adversary proceeding under Rule 4007 and Rule 7001. This Court has jurisdiction over both of these matters under 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). These matters are statutorily and constitutionally core under 28 U.S.C. § 157(b)(2)(A), (I), & (O). This Court therefore has the authority to hear these matters and make a final determination. No party has contested jurisdiction or the Court's authority to make final determinations.

*Note Regarding Structure of the Opinion*

The Court will first address the undisputed facts and then move to the law and the disputed facts regarding the Amended Motion to Dismiss or Convert and then the law and disputed facts regarding the dischargeability action. Some of the facts and conclusions are mixed facts and conclusions, which will be noted where appropriate.

**Part I: Motion to Dismiss or Convert**

*Undisputed Findings of Fact[2]*

The Court finds the following facts undisputed based on the allegations, answers, admissions, and other evidence:

1. On April 1, 2013, the Debtor signed an Exclusive Buyer Agency Contract with Chartwell Realty and agent John Strong ("Strong"). The Contract provided that "buyer desires to purchase real property described as follows," and a box was checked that said

---

[2] Throughout this opinion, the Court will refer to the Debtor Sharon West as the "Debtor," and Randy and Sherri James collectively as the "Jameses." All references to Code sections will be to Title 11 of the United States Code, and all references to Rules will be the Federal Rules of Bankruptcy Procedure, unless otherwise noted.

"residential," with a general location of Jackson and Cass County, Missouri, and for an approximate price range of $450,000 to $1,000,000.

2. On April 6, 2013, the Debtor signed a residential real estate sale contract (the "Contract"), making an offer to buy from the Jameses their house on 24 acres at 24704 Haines Road, Greenwood, Missouri for the price of $999,500. The purchase price was payable with earnest money in the form of a personal check of $10,000 plus certified funds for the balance of $989,500 on or before the closing date of May 2, 2013.

3. The Jameses signed the Contract on April 9, 2013.

4. The Contract had no financing contingencies.

5. Paragraph 7 of the Contract had a box checked next to the statement: "This is a cash sale. Buyer must provide written verification from a depository of funds on deposit within ____ calendar days (5 days if left blank) which are sufficient to complete the closing on this contract."

6. The Debtor did not tender the $10,000 earnest money at the time she signed the Contract or at any later time.

7. The Debtor did not tender written verification from a depository of funds at the time she signed the Contract or at any later time.

8. The Debtor did not have the personal income or assets to fund the $10,000 earnest money at the time she signed the Contract or at any later time.

9. The Debtor did not have personal income or assets to fund the $989,500 purchase price at the time she signed the Contract or at any later time.

10. The Contract also provided that "time was of the essence."

11. The Contract did not close on May 2, 2013.

12. The Jameses orally extended the closing date twice but the sale did not close.

13. Shortly thereafter, the Jameses sued the Debtor, her boyfriend at the time, Robert Knowles ("Knowles"), Strong, and Chartwell Realty for breach of contract, specific performance, and fraud in Jackson County Circuit Court, Case No. 1316-CV11728.

14. The Debtor was served by residential service through Knowles.

15. Knowles had lived with the Debtor for 10 years.

16. Knowles had been present when she looked at the Property and signed the Contract.

17. Knowles had been involved after the Debtor signed the Contract, and had communicated with Strong on the Debtor's behalf.

18. Knowles did not tell the Debtor about the lawsuit.

19. Knowles did not tell the Debtor he hired an attorney on their joint behalf to defend them in the lawsuit.

20. The attorney never talked to his purported client, the Debtor, and later withdrew from the representation.

21. Neither the Debtor nor Knowles answered the discovery or attended the depositions scheduled by the Jameses.

22. The Jameses filed a motion against the Debtor and Knowles seeking sanctions under Missouri Rule 61.01, "including the striking of defendant's pleadings and entering judgment against them." The Jackson County Circuit Court granted the motion, finding that the Debtor's and Knowles' failure to appear or answer discovery was unexcused and had prejudiced the Jameses, and that the "severest of sanctions authorized by Rule 61.01 was justified."

23. The state court struck the Debtor and Knowles' answer and entered default judgment against them. The state court later conducted an evidentiary hearing on damages, after which the court entered judgment on September 18, 2014 for $139,534.73 in actual and compensatory damages and $999,500 in punitive damages, for a total damage award of $1,139,034.73, accruing interest at the judgment rate of 9%.

24. The Debtor did not discover the judgment until she learned from her payroll department that the Jameses had garnished her wages in January 2015.

25. The Debtor filed a voluntary petition for Chapter 7 relief on February 17, 2016.

26. The Debtor scheduled the Jameses' judgment on her Schedule E/F in the amount of $1,139,034.73.

27. The Debtor scheduled other unsecured debts in the amount of $18,034.88, making her total unsecured debt $1,157,069.61.

28. The Debtor also scheduled a car loan of $5,274 secured by a 2010 Hyundai Elantra she valued at $6,000.

29. The Debtor does not own any real estate. Her personal property assets as scheduled were otherwise minimal and were all claimed exempt without any objection.

30. Debtor is a single woman with no dependents of approximately 60 years of age, who has worked for approximately seven years (by the time of the trial) as a nurse supervisor at a hospital clinic.

31. She earns approximately $80,000 per year, or $6,630.33 per month gross.

32. On her Schedule I of income, the Debtor deducted the Jameses' pending garnishment of approximately $1,120.54 per month as a deduction from gross income, resulting in adjusted gross income (after payroll deductions) of $2,995.46.

33. On her Schedule J of expenses, the Debtor listed $3,093.70 in monthly expenses, resulting in a Schedule J showing negative monthly income of $98.24.

34. After the bankruptcy filing, the Debtor's lawyers filed a motion in state court seeking to vacate the default judgment.

35. After the Jameses filed the original motion to dismiss or convert, the state court entered an order voiding the punitive damages portion of the judgment as a due process violation.

36. The Jameses' amended proof of claim reflects that the balance of their judgment as of the date of filing, after credit for amounts garnished and after vacation of the punitive damages, is $145,117.89.

37.  The Jameses then filed their amended motion to dismiss or convert.

38. In the interim, the Debtor filed an amended Schedule I and J, which removed the garnishment deduction but increased certain food and other expenses, leaving approximately $592 of disposable income.

39. The Court will make additional findings of fact and mixed findings where appropriate.

### *Conclusions of Law*

The Amended Motion to Dismiss or Convert is pled in three counts: (1) a motion to dismiss for abuse under § 707(b)(1), (2), and (3); (2) a motion to convert to Chapter 11 under § 706(b); and (3) in the alternative, a motion to convert to Chapter 13. It is undisputed that the Jameses as movants generally have the burden of proof, except that, if a presumption of abuse arises under § 707(b)(2), the burden then shifts to the Debtor to prove "special circumstances" and that the case is not an abuse. The Court will address each count in turn.

I.      *Count 1: Motion to Dismiss Pursuant to § 707(b)(1), (2) & (3)*

Section 707(b)(1) provides in relevant part that, "after notice and a hearing, the court . . . on motion by a party in interest . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter."

In this case, there has been notice and a hearing and no party has contested that the Jameses, as creditors in this case, are parties in interest to bring the motion. It is also uncontested that the Debtor as an individual Chapter 7 debtor does not consent to conversion of her Chapter 7 case either to Chapter 13 or 11. Rather, the mixed factual and legal issues in dispute under § 707(b)(1) are: (1) whether the Debtor's debts are "primarily consumer debts," and (2) whether the granting of relief under Chapter 7 would be an abuse of the provisions of Chapter 7.

The Jameses bear the burden of proof to demonstrate abuse. *In re Booker*, 399 B.R. 662, 665 (Bankr. W.D. Mo. 2009). Because the statutory language uses the word "may" instead of "must" or "shall," the Court is under no obligation to dismiss even if all of the requirements are met. "Furthermore, the moving party bears the burden of proving by a preponderance of the evidence that [the] Debtor's scheduled debts are primarily consumer debts." *In re Braathun*, No. 07-00771-lmj7, 2011 WL 1299605, at *4 (Bankr. S.D. Iowa April 4, 2011).

### *At the Threshold, A Practical Discussion Regarding the Means Test*

The practical importance to a litigant of seeking dismissal pursuant to § 707(b)(1) is that if the debts are primarily consumer debts, the debtor must complete an official form known as a "means test." In 2005, the BAPCPA amendments to the Bankruptcy Code amended § 707(b)(1) and added § 707(b)(2) and (3), reflecting Congressional belief that too many debtors were filing

Chapter 7 liquidation bankruptcies (instead of repayment plans, such as Chapter 13s) when they actually had the ability to devote their income to pay something back to creditors. Section 707(b)(2) sets out a complicated formula to determine if an individual debtor with primarily consumer debts has "current monthly income" – a defined term under § 101(10A)—sufficient to fund a Chapter 13 plan based on an ability to pay back a certain amount or percentage to unsecured creditors over a presumed 60-month plan.

If a debtor has sufficient "current monthly income" based on the formula set forth in § 707(b)(2)(A)(i)(I) or (II), then abuse is presumed as a matter of law and the burden shifts to the debtor to rebut the presumption of abuse by showing "special circumstances" as set forth in § 707(b)(2)(B)(i); otherwise, the case will be dismissed if the debtor does not agree to conversion. As will be discussed below, if the presumption of abuse does not arise, or if the debtor is able to rebut the presumption, the case may still be dismissed under the totality of circumstances standard set forth in § 707(b)(3).

The formula in § 707(b)(2) is implemented by the official "means test" form. The means test form follows the formula set forth in §§ 101(10A) and 707(b)(2) and determines whether the presumption of abuse arises for any given debtor. It also determines how much a Chapter 13 debtor may have to pay unsecured creditors in Chapter 13 under Section 1325(b).[3] There has been significant litigation over the formula in § 707(b)(2) and how the calculation of "current monthly income" in § 101(10A) is incorporated into § 1325(b), the most notable cases being *Hamilton v. Lanning*, 560 U.S. 505 (2010) and *Ransom v. FIA Card Services*, *N.A.*, 562 U.S. 61 (2011).

---

[3]    The Chapter 13 Means Test Form is slightly modified from the Chapter 7 Form to reflect administrative costs of the Chapter 13, such as the Chapter 13 Trustee's fee, among other items.

The practical difficulty with the current monthly income formula is that, generally speaking, it requires the debtor to start with six months of gross income for the six months ending on the month before the filing date (*e.g.*, here, the Debtor filed February 17, 2016, so it would require her to list gross income for the six-month period starting on August 1, 2015, through January 31, 2016), then to divide this income by twelve and to annualize it. The "total current monthly income" thus derived is then compared to "median income" for the debtor's household size in the state in which she lives as of the date of the bankruptcy filing.

The problem with this formula is vividly illustrated by the facts in *Hamilton v. Lanning*, where the debtor received a large one-time severance payment during the six-month period before she filed her Chapter 13 bankruptcy. This payment effectively doubled her annualized monthly income, resulting in a "current monthly income" that was impossibly high based on her actual, much lower income at the time she filed. It meant that the debtor did not, based on the formula, qualify for Chapter 7 since her case was presumed an abuse, but that she likewise could not fund a Chapter 13 because the formula produced a "projected disposable income" she was required to pay creditors that was not realistic.[4]

The other practical problem with the means test formula is that, rather than deducting the debtor's actual living expenses from the formula-derived "income," the Code requires the debtor to deduct allowances for housing, transportation, food, and utilities based on IRS collection guidelines. Thus, the formula can produce both unrealistically high or low incomes and unrealistically high or low expenses, depending on whether the debtor and any dependents are spending more or less than the IRS allowances.

---

[4]        The debtor in *Hamilton v. Lanning* filed a Chapter 13 case. The Bankruptcy Court, the Hon. Janice Miller Karlin presiding, confirmed the debtor's Chapter 13 plan based on her lower, actual income, rather than the higher "projected disposable income" the means test form derived. The Chapter 13 Trustee appealed from that ruling, but the Supreme Court ultimately affirmed Judge Karlin.

Many courts and commentators have noted that the § 707(b)(2) formula, intended to prevent abuse, leaves room for manipulation and thus encourages more abuse; it may result in an artificial and arbitrary income that is neither "current" nor "monthly" nor in some cases even "income." The Supreme Court's ruling in *Hamilton v. Lanning* that a court could consider known or virtually certain information in considering projected disposable income for Chapter 13 purposes slowed the litigation under these sections, but has not eliminated it entirely; confusion and interpretation battles still persist.

In this case, since the Debtor's income was relatively stable on a monthly basis, the income side of the formula does not result in an unrealistic income. But single individuals such as the Debtor, with inexpensive car loans and no mortgage or dependents, are often disadvantaged under the expense side of the formula. As will be seen below, with respect to the expense side, the formula produces an unrealistic result for this Debtor, particularly since she spends more to live than some of the IRS allowances, and since she is not able to take advantage of favorable allowances for those with high mortgage and car payments.

These observations are not made to justify the Court's ruling in this case, but to provide background as to why, in the Court's experience, a debtor and her lawyers do not voluntarily complete a means test if the law does not require it. The means test is legally and factually complicated; it puts the burden of proof on the debtor to rebut the presumption of abuse (if one arises); and it may add additional legal fees to an otherwise already expensive representation.[5] Since completing the means test is only required if an individual debtor has "primarily consumer

---

[5]     It is well-known that BAPCPA significantly increased the attorney fees for filing bankruptcy, and that many courts authorize additional fees if the attorney is required to complete a means test for the filing. (The Western District of Missouri, for example, authorizes an additional $500 fee for "above median" cases).  In this case, Debtor's counsel charged a flat fee of $2,500 for her Chapter 7 case.

debts," a debtor who does not have primarily consumer debts would never voluntarily complete the means test unless otherwise ordered by the Court.

### Whether the Means Test in Debtor's Case Would Trigger a Presumption of Abuse

The Jameses adduced testimony from a bankruptcy lawyer about what the Debtor's means test would show if a means test were prepared based on the income and expenses in her Schedules I and J.[6] Based on this evidence, the Court finds and concludes that if the Debtor were to file a means test she would show disposable income of $1,918.08 per month, triggering the presumption of abuse. For Chapter 13 purposes, this means that, under § 1325(b), the Debtor might be required to contribute this amount to pay her unsecured creditors over 60 months (minus the Chapter 13 trustee fees and other allowed deductions), even though her actual budget based on the amended Schedules I and J shows she has much less left over ($592) in her monthly budget.

### Whether the Jameses' Judgment is a Consumer Debt; Definitions of Relevant Terms

Turning back to the issue of whether the case should be dismissed or converted under § 707(b), the first issue is whether the Jameses' judgment is a "consumer debt." "Consumer debt" is defined by § 101(8) as "debt incurred by an individual primarily for a personal, family, or household purpose." The term "debt" is defined in § 101(12) as "liability on a claim." "Claim" is defined in § 101(5) as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Under these definitions, the James' judgment is without question a "debt." The question is whether the Debtor incurred the debt "primarily for a personal,

---

[6]     The Jameses designated the attorney as an expert witness; the Court granted in part the Debtor's motion in limine to exclude any expert testimony by the attorney on the ultimate legal issue of whether the case is presumed an abuse.

family, or household purpose." This phrase is not defined, and therefore the Court looks to case law to determine what this phrase means.

### *Definition of "Primarily"*

The Eighth Circuit has not addressed the meaning of "primarily" in the context of § 707(b), but the majority of cases elsewhere hold that "primarily" means more than half by total dollar amount of all debt. *See, e.g.*, *In re Kelly*, 841 F.2d 908, 913 (9th Cir. 1988). The "primarily" component is not in issue here since it is undisputed that the Jameses' debt is much more than half of the Debtor's total debts.

### *Consumer Debt is Based on Purpose/Intent*

Courts in the Eighth Circuit have addressed what constitutes a consumer debt, however. To determine whether a debt is a consumer debt, courts look to the debtor's purpose or intent in incurring the debt. *E.g., In re Lapke*, 428 B.R. 839, 843 (B.A.P. 8th Cir. 2010). A mortgage-type debt, or a debt secured by real property that is voluntarily incurred to buy a home or make improvements, is the paradigm example of a consumer debt. *Lapke*, 428 B.R. at 843; *In re Cox*, 315 B.R. 850, 855 (B.A.P. 8th Cir. 2004). "With respect to debt secured by real property, if the debtor's purpose in incurring the debt is to purchase a home or make improvements to it, the debt is clearly for family or household purposes and fits squarely within the definition of a consumer debt under § 101(8)." *Cox*, 315 B.R. at 855.

The converse of a consumer debt is a debt "incurred for business ventures or other profit-seeking activities" — these debts do not fall into the category of debt incurred for personal, family, or household purposes. *In re Hoffner*, No. 07-30461, 2007 WL 4868310, at *1 (Bankr. D.N.D. Nov. 21, 2007)). Even if a debtor's purpose or intent is mixed, such as to buy the home and later sell it at a profit, the debt is still considered a consumer debt so long as the debtor

intends to live in the home. *Cox*, 315 B.R. at 855; *In re Grover*, No. BR 12-01069, 2013 WL 3994608, at *4 (Bankr. N.D. Iowa Aug. 2, 2013).

Whether a debt is a consumer debt is thus a question of fact. *Cox*, 315 B.R. at 855.

***Parties' Arguments About the Jameses' Debt***

In this case, the Debtor contends that the Jameses' debt is a business debt, arguing that her intent in buying the Jameses' home was to turn it into a bed and breakfast ("B&B"), a profit motive that would render the debt a business debt. She testified that although she did not have the income or assets to purchase the home, she was relying on Knowles' wealthy brother and a friend, who were going to be investors in the B&B and advance the money for the purchase. She testified that she trusted and relied on Knowles, and left the bulk of the financial and real estate details to him; that he told her the closing with the Jameses had fallen through but that his brother and friend were still working on another way to acquire the Jameses' home; and that she was otherwise assuming the B&B deal was still in process, even though she had not closed on the Jameses' home in May 2013; and was otherwise unaware that there was no deal and that she had been sued until she received the wage garnishment in January 2015.

The Jameses vigorously dispute and question the Debtor's intent and profit motive, flatly implying that no one could be this trusting and expressly accusing her of lying. The Jameses in closing argument pointed to evidence showing or tending to show: (1) the Debtor made her offer to the Jameses on a residential real estate contract form; (2) she never told Strong that she intended to buy the house for a B&B; (3) she admitted she intended to live in the house; (4) she personally undertook no objectively reasonable steps to verify if she could ever turn the house into a B&B or turn a profit; (5) she had no receipts or documentary proof for items such as books and accessories she claimed she bought for the B&B, nor proof that she had even looked at

certain B&B-related websites before she made the offer; and (6) she was a sophisticated businesswoman who had owned and operated a small karate business previously.

Although most of this is true, the evidence of the Debtor's intent is mixed, making the factual determination a close call. The Court ultimately believes that the issue rests on the Debtor's credibility. The Court concludes that the Jameses have not met their burden of proof to prove the Debtor's intent and purpose was merely to purchase a residence, thus rendering their debt a consumer debt. The Court draws this conclusion for two independent reasons, one factual and one legal.

### *First, the Jameses' Debt is not a Consumer Debt but a Business Debt Based on the Court's Factual Findings Based on Credibility*

#### *The Court Believes the Debtor That Her Intent/Purpose Was to Purchase a Home to Run a B&B*

First, the Court is convinced based on the Debtor's credible testimony that her motive and intent was to purchase the Jameses' home for a B&B. Randy James, a lawyer representing himself, called the Debtor as a hostile witness during the first day of trial, and the Court was initially troubled by some of her evasive, waffling, and nonresponsive answers to his questions. As the lengthy examination progressed, however, the Debtor held her own, offering numerous, consistent, and credible small details under the frankly withering examination.

It was apparent to the Court that the Debtor had not been adequately prepared by her own counsel for the degree of scrutiny by Randy James and his wife's counsel on the issue of whether the Debtor was lying about her intent to run a B&B. Yet, the Debtor persisted with details about the intended B&B: books she or Knowles purchased; the themes of the various rooms she planned; the websites she had visited; the accessories and figurines she purchased or intended to use to furnish the rooms according to the planned theme; and even the intended name of the

14

B&B as "Sha-Rob," a combination of her name and Knowles.' She testified credibly that she had considered what she could charge for a room given the house's location compared to other nearby B&B's, and that the house and its acreage could be used for other events and functions.

The Court believes and finds her testimony credible and consistent in that she and Knowles believed that opening and operating the B&B would be a "process" and "done in phases"; that the small amount of work she had done before she made an offer for the Jameses' property was consistent with the idea that opening a B&B would be a "process"; that she did not keep receipts of the books or other items because they were purchased at garage or estate sales or on eBay for small amounts of money; and that it was her plan with her long-time boyfriend to retire and run the B&B, with her as the "people person" and him as the "maintenance guy." The Debtor testified to these details in the face of a hostile cross-examination and in a heartfelt and consistent way, and the Court simply does believe that she could have fabricated these consistent details on the spot and under the pressure of cross-examination.

### The Court Rejects the "Mastermind" Argument

Based on the Court's close observations of the Debtor both times she testified, first nearly all day as a hostile witness, and then when she was called by her own counsel the second day of trial, the Court does not believe the Debtor is lying about her business motive. Nor does the Court believe, as the Jameses would suggest, that she came up with the B&B idea after the fact to be able to discharge the Jameses' debt. There was no indication from the Debtor's background or testimony that she was as "sophisticated" as the Jameses argued, let alone so sophisticated that she masterminded a scheme to make an offer to purchase a house she could not afford from people she did not know so that later on when she was sued she could lower her attorney fees for filing bankruptcy by not having to fill out a means test form.

Rather, the only reasonable explanation for someone living in otherwise modest housing accommodations and without significant means to make an offer to buy a million-dollar home is that she truly believed Knowles' brother and his friend were going to finance the purchase of the home as an investment for a B&B. The Jameses' argument that she fabricated the B&B story to avoid discharging their judgment is also based on a faulty assumption of the law — whether a debt is a business debt or consumer debt is not relevant to whether the debt is dischargeable under § 523.[7]

### The Court Rejects the "Sophisticated Businesswoman" Argument

The Court also rejects the Jameses' argument that the Debtor is a sophisticated businesswoman. The Court finds factually that the Debtor is not a sophisticated businesswoman based on its observations of her and her testimony; these observations included her use of certain unsophisticated terms in describing her plans and sometimes less than polished grammar. Likewise, in the absence of other evidence, running a small karate business after regular work hours for the admitted purpose of helping her son and other children — and even having a supervisory role in a hospital clinic — do not necessarily transform a person into a "sophisticated businesswoman." It was clear that the Debtor had not established the karate business for the money. The argument that the Debtor is sophisticated financially and business-wise was also severely undercut by the evidence the Jameses adduced showing that she had other debts in collection.

### The Court Rejects the Argument that the B&B Could Never Have Been Profitable as Relevant to Debtor's Intent/Motive

The Jameses did adduce evidence that, based on their own cost to live in and maintain the Property, it was highly unlikely that the Debtor could operate a B&B there at a profit. But the

---

[7]     It is relevant for purposes of fee-shifting in § 523(d), discussed below.

Court does not necessarily find that evidence relevant to the Debtor's purpose and intent. Again, in the face of being confronted with the high monthly living expenses the Jameses incurred, the Debtor held her own, noting that Knowles would have done the maintenance himself, among other details. The Court also does not find it nearly so troubling as the Jameses do that the Debtor did not prepare a business plan or that, if she had done so, a reasonable business person would have concluded that running a B&B would likely not be profitable. If all people approached starting a business with a business plan and realistic projections of income and expenses, there would be no need for bankruptcy protection.

Although the Court believes that the Debtor was hopelessly naive in her plans to create "Shar-Rob," the Court finds that she did focus on the financial details she thought were relevant to her plan, and that it was subjectively reasonable for her to rely on Knowles, whom she loved and trusted, to come up with financing, as objectively unrealistic as that might seem after the fact.

### *The Conflicting Testimony From Strong, the Debtor's Buyer's Agent*

There is conflicting testimony about whether the Debtor told Strong, her buyer's agent, that she and Knowles were intending to run a B&B; Strong denies it. The Court discounts much of the testimony of the unreliable Knowles on this point. But the Court finds the Debtor's testimony has more of a ring of truth than Strong's, based on the Court's observations of both witnesses.

Strong was also sued by the Jameses and was overly forthcoming and solicitous in his answers to Jameses' questions, in contrast to the Debtor's counsel's questions. Strong appeared to have some incentive to provide helpful testimony to the Jameses, although any bias was not explored by the Debtor's attorneys on cross-examination.

But Strong's testimony that he remembers in detail what the Debtor and Knowles said when Debtor signed the Contract is also undercut by his testimony that he had participated in thousands of contracts and closings in his real estate career. It is simply unrealistic to believe that Strong remembered all the details of what was discussed at the Contract signing. Also, since the purpose of a B&B is to reside there, the Court does not necessarily put much stock in Strong's testimony that he would have checked the "other" box on the buyer's agent form or presented the offer using a commercial contract form if the Debtor had told him she was making the offer to buy the Property for a B&B. In sum, even if the Court believed Strong's testimony that the Debtor did not tell him about her B&B plans, that testimony does not overcome the other evidence of intent and motive based on the Debtor's credible testimony.

### *The Mixed-Motive* **Cox** *Case is Distinguishable*

As discussed above, the *Cox* case held that even when a debtor had a "mixed motive," a debt incurred to buy a home is still a consumer debt so long as the debtor intends to live in the home. The Court believes *Cox* is distinguishable from this case, however, since by definition a B&B is a type of lodging business that requires the homeowner to live there. Based on the factual finding that the Debtor had the intent to purchase the Jameses' Property for the business purpose of running a B&B, the Court concludes that the Jameses' debt is not a consumer debt.

### *Second, In the Alternative, the Debt is Not Consumer or Business but is Interstitial*

In the alternative, even if the Debtor's testimony were not credible, the Court finds that the Jameses have not met their burden of proving the debt is a consumer debt based on a plain reading of the phrase "incurred for a personal, family or household purpose." The Court concludes as a matter of law that the debt was not "incurred" for a personal, family or household purpose, for the following reasons.

Courts that have carefully considered the phrase "incurred for a personal, family or household purpose" note that all the words in the phrase, including the word "incurred," must be considered. These courts reason that some debts are "interstitial" – they are neither consumer nor business debts. For example, a debt arising from an intentional tort is not a consumer or a business debt; a debtor does not ordinarily commit an intentional tort for either a personal or business purpose. *See In re Peterson*, 524 B.R. 808 (Bankr. S.D. Ind. 2015). Likewise, tax debts are generally not considered consumer debts because they are not voluntarily "incurred." *In re Westberry*, 215 F.3d 589 (6th Cir. 2000); *In re Stovall*, 209 B.R. 849 (Bankr. E.D. Va. 1997).

The Court finds and concludes that the Jameses' debt is an interstitial debt. The debt was created when the state court granted the Jameses' motion for discovery sanctions under Missouri Rule 61.01 and imposed, according to the plain language of the judgment, the severest sanction of striking the Debtor's pleadings. The plain language definition and common sense understanding of "incurred" pursuant to a *Black's Law Dictionary* definition means "to suffer or to bring on oneself," indicating an element of volition. *Incur*, BLACK'S LAW DICTIONARY (8th ed. 2004); *see also Peterson*, 524 B.R. 808; *In re White,* 49 B.R. 869 (Bankr. W.D.N.C. 1985).

The Debtor in this case did not voluntarily incur a sanctions judgment; the Court believes her credible testimony that she did not know of the Jameses' lawsuit or the pending discovery. Her testimony is buttressed by the extraordinary admission against interest of the state court lawyer who credibly testified that he filed an answer on the Debtor's behalf in the state court action without ever talking to or meeting her.

The only case this Court found that rejected the volition requirement is *In re Walton*, 69 B.R. 150 (Bankr. E.D. Mo. 1986), *aff'd*, 866 F.2d 981 (8th Cir. 1989). But in *Walton*, the Eighth

Circuit on appeal did not reach the issue of whether "incurred for a household purpose" means willingly incurred, and this Court finds the underlying facts of that case distinguishable.

The Court had alerted the parties to this issue at an earlier pretrial conference, and invited the parties to provide authority to supplement their trial briefs. The Jameses did not provide any supplemental authority, but argued that the judgment is not a sanctions judgment. The Court rejects that argument based on the plain reading of the state court judgment, which clearly states it came about as a result of the Jameses' Rule 61.01 sanctions motion.

### *Conclusion As to § 707(b)(1) and (2) – Presumption of Abuse and Consumer Debt*

The Court thus concludes that the Jameses' debt is not a consumer debt and that the Debtor's debts are not primarily consumer debts based on a finding of fact that the Debtor had a profit motive when she executed the Contract with the Jameses to purchase their home and turn it into a B&B. In the alternative, the Court concludes that the Jameses' debt is a sanctions judgment – an interstitial type of debt that is neither consumer debt nor business debt – since the Debtor did not know of and therefore could not have voluntarily incurred the sanctions judgment. Accordingly, the Debtor was not required to complete a means test form, such that the presumption of abuse does not apply.

### *In the Alternative, the Court Would Not Exercise Discretion to Require Dismissal or Conversion*

The Court has already discussed above that even if all the elements of § 707(b)(1) are met, the Court need not exercise its discretion to dismiss or convert the case. Here, even if this Court is incorrect about the weight of the evidence, its legal interpretation of "consumer debt," or the law as applied to the facts of this case, the Court would not exercise its discretion to dismiss or convert, because the Court cannot conclude that the Debtor's filing of this case is an abuse of the Bankruptcy Code.

A review of the schedules admitted into evidence reveals that the Debtor has:

- Only one secured creditor secured by a 2010 Hyundai Elantra with scarcely any equity

- No owned real estate but a house rented on a month-to-month basis

- Minimal personal assets, all claimed as exempt, including two small retirement plans insufficient for a woman in her 60s

- 25 scheduled unsecured creditors[8] holding approximately $18,000 of scheduled debt in addition to the Jameses' debt, many of the debts being in collection or judgment status

- Reasonable and not excessive living expenses given her stable job and relatively high income

- $592/month of disposable income as of the date of the filing, but only if the Debtor continues to work at her current job with its current medical benefits, continues not to prepare adequately for her retirement, does not need another car, and does not have to move

Also, the statement of financial affairs and credit counseling certificate reveal that the Debtor did not file bankruptcy until she had been garnished for more than a year, and only then paid her bankruptcy lawyer and completed the credit counseling course in February 2016, the month she filed.

---

[8] During the hearing, the Debtor testified that some of the debts and some of the creditors may be duplicates or paid off since the filing. However, she also testified that she compiled the debts based on her credit report, a very common and practical way to approach scheduling debts. The Court is not clear that some of the debts were duplicates, since there are different collectors and different account numbers listed, but even if there are somewhat fewer than 25 creditors holding somewhat less than $18,000, it does not change the Court's analysis about whether the filing is an abuse.

Given the Debtor's age and financial situation, the Court cannot find that the Debtor's bankruptcy filing is an "abuse." If the Debtor had not filed bankruptcy, the Jameses would have continued to garnish $1,120 per month from her wages (approximately $13,440/year) while their judgment continued to accrue interest at 9% per annum – more than $90,000 per year on the $1.1 million judgment that was in effect the day she filed. Although the judgment has now been reduced to $145,000, 9% interest on $145,000 equates to approximately $13,050/year. This means that the amount being garnished would just about keep pace with the accruing judgment interest, such that the debt would never significantly decrease in her lifetime. And that is not accounting for what might happen if the Debtor's other creditors holding debts in collection or judgment began garnishment proceedings.

The Court believes these facts make the Debtor's case distinguishable from other presumption-of-abuse or bad faith cases, which focus on the percentage of a certain creditor's debt vis-à-vis all debt. Here, the Debtor had sufficient other debt and other reasons besides the Jameses' debt to consult with experienced bankruptcy counsel and file bankruptcy. Thus, the Court concludes as a matter of law, that, even if the Debtor's debts are primarily consumer debts, such that the presumption of abuse arises, the Court would not exercise its discretion to consider this case an "abuse" and order dismissal or conversion. The Court therefore denies the Jameses' Motion to dismiss or convert under § 707(b)(1) and (b)(2), for all the reasons stated.

### *Final Grounds for Relief in Count I: § 707(b)(3)*

Before reaching Count II of the Jameses' Motion, the Court must still consider their request for dismissal for abuse under § 707(b)(3), on the grounds that the case was filed in bad faith and that the totality of the circumstances show bad faith. Under § 707(b)(3), unlike § 707(b)(2), the Court has a fair amount of flexibility. *In re Boatright*, 414 B.R. 526, 530 (Bankr.

22

W.D. Mo. 2009). Section 707(b)(3) was enacted as part of the BAPCPA amendments to the

Code in 2005, so pre-BAPCPA cases are not as helpful, especially because the standard is now

"abuse" – not "substantial abuse." Under the bad faith analysis of § 707(b)(3)(A),

> [I]n determining whether the filing was made in bad faith, the Court should focus
> primarily upon the Debtors' conduct, including whether the Debtors have
> complied with the applicable provisions of the Bankruptcy Code and the Federal
> Rules of Bankruptcy Procedure, whether they have engaged in any concealment
> or misrepresentation in connection with the case or otherwise manipulated the
> Bankruptcy Code.

*Booker*, 399 B.R. at 672.

Although courts debate the relevant considerations under the "totality of the

circumstances" test, post-BAPCPA, courts in the Western District of Missouri have consistently

held that the most important (and perhaps only) consideration under § 707(b)(3)   is the ability to

pay creditors. *See Booker*, 399 B.R. at 667 ("[W]hen assessing whether the case should be

dismissed as an abuse based upon the totality of the Debtors' financial circumstances, the Court

should consider primarily, if not exclusively, the Debtors' ability to pay"); *Boatright*, 414 B.R. at

530 (noting that the ability to pay a "significant portion of unsecured debt" is the predominate

consideration); *see also In re Freis*, No. 06-30393, 2007 WL 1577752, at *2 (Bankr. W.D. Mo.

May 18, 2007).

In this case, the Jameses' primary argument in their Amended Motion in support of

dismissal under § 707(b)(3) was the Debtor's inclusion of their pending garnishment in her

original Schedule I. Other evidence was allowed to develop without objection, however, about

certain errors in the Debtor's schedules, including an erroneous date listed for when a debt was

incurred, an increase in her living expenses in her Amended Schedule J, possible duplicative

creditors, and her failure to schedule the items she had purchased for the B&B.  The Court does

not find that these de minimis errors are evidence of bad faith.

23

As discussed above, the Debtor included the Jameses' garnishment on her original Schedule I. Obviously, the Debtor should not have deducted the Jameses' pending garnishment, since the garnishment would stop automatically as of the date of filing based on the automatic stay of § 362(a). The Court believes, however, the Debtor's credible testimony that she thought she was supposed to reflect her current budget, which suffered from a garnishment, when she filed the bankruptcy; frankly, in the Court's experience, a debtor's lawyer typically reviews the budget and corrects such errors, consulting with the debtor and adjusting the budget accordingly.

In any event, the Jameses' original Motion to Dismiss was filed some five months after the Debtor filed bankruptcy, and raised for the first time, as far as the Court is aware, that the garnishment should not have been reflected as a deduction on the Debtor's Schedule I. The Debtor, less than two weeks after the Motion to Dismiss was filed, amended her Schedules I and J to remove the garnishment deduction. The promptness of the amendment, coupled with the Debtor's credible testimony about the reason she scheduled the deduction to begin with, refutes the argument that the original error of including the garnishment in the budget is evidence of bad faith. Moreover, the Jameses have not argued that they were harmed or prejudiced by the error; any party reviewing the original Schedule I could have seen that the garnishment was a mistake and calculated the mathematical effect on the disposable income accordingly. The Court can presume the Jameses knew they could not continue to garnish the Debtor since there is no evidence that the garnishment continued postpetition.

As far as the unscheduled items, the Court believes the Debtor's credible testimony that the value of those items was likely less than $25 and that because they were packed away in boxes she did not think about them in preparing her Schedule A/B of assets. Although the Court never condones any failure to schedule assets, here, the Court rejects the Jameses' argument that

the Debtor's failure to schedule the approximately $25 worth of figurines and decorative items intended to be used for the B&B is evidence of her bad faith, for several reasons.

First, the Court has already noted that the primary consideration for dismissal for abuse under § 707(b)(3) is ability to pay, not concealment of assets. The Jameses did not file a § 727 complaint for denial of discharge for concealment of assets or false oath. Instead, they filed a Motion to Dismiss, and did not allege these errors as part of their Motion. Thus, as a practical matter, the nature and value of these assets and how they should have been scheduled, if at all, was not an issue before the Court.

Second, it is questionable whether the items even had to be separately scheduled. They appropriately could have been considered household goods, and the Debtor still had available an unused household goods and furnishings exemption.[9] Moreover, the Schedule A/B requires separate scheduling of "Collectibles of Value" — it is doubtful that $25 of miscellaneous angel and other figurines and decorative items could even be considered "collectibles" under that definition.

The same analysis is true about whether the items should have been scheduled as "any business-related property." The Court questions whether the items were "business property" as of the petition date. At that point, it was clear to the Debtor that the B&B had fallen through.

The Court otherwise detected no other evidence of bad faith in the Debtor's testimony or in her bankruptcy filing. In sum, these "errors" are de minimis; there is no evidence of any prejudice to the Jameses or the Chapter 7 Trustee. The Jameses had the opportunity to take the Debtor's Rule 2004 exam and conduct other discovery and they point to no other issues of bad faith, concealment, or misrepresentation.  And, most importantly, these "errors" have no bearing

---

[9]    Debtor scheduled $500 of household goods and furnishings, in addition to clothing and electronics. Missouri law allows a $3,000 exemption for these items. § 513.430.1(1) RSMo.

Case 16-40358-can7   Doc 102   Filed 02/24/17   Entered 02/24/17 12:20:24   Desc Main
Document      Page 26 of 71

on the primary factor of ability to pay, which will be discussed below in conjunction with the Court's analysis of Counts II and III of the Motion.

The Court therefore concludes that the Jameses have failed to meet their burden to prove that the Debtor's debts are "primarily consumer" debts or that the Debtor filed the case in bad faith or that the totality of circumstances shows bad faith. The Court denies Count I of the Jameses' Amended Motion to Dismiss.

## II.      *Count 2: Motion to Convert to Chapter 11*

Count II of the Jameses' Amended Motion seeks, in the alternative to dismissal, conversion to Chapter 11 under § 706(b). For the reasons stated below, the Court denies Count II of the Jameses' Amended Motion.

Section 706(b) provides that, "[o]n request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time." Section 706(b) does not state under what circumstances a court should consider conversion; courts therefore retain discretion to order conversion under § 706(b). *In re Schlehuber*, 489 B.R. 570, 573 (B.A.P. 8th Cir. 2013), *aff'd*, 558 Fed. App'x 715 (8th Cir. 2014). The movant generally bears the burden to show grounds for conversion to Chapter 11 under § 706(b). *In re Ryan*, 267 B.R. 635, 637–38 (Bankr. N.D. Iowa 2001). This burden includes showing a debtor's ability to reorganize through a Chapter 11 plan. *Id.*

In the Eighth Circuit, the decision whether to convert is "based on what will most inure to the benefit of all parties in interest." *Schlehuber*, 489 B.R. at 573; *In re Willis*, 345 B.R. 647, 654 (B.A.P. 8th Cir. 2006). Because § 706(b) does not contain conversion factors, a court "should consider anything relevant that would further the goals of the Bankruptcy Code." *Schlehuber*, 489 B.R. at 573. In *Schlehuber,* the court noted that the most important factor under § 706(b) is

the ability to fund a Chapter 11 plan. *Id.*  Because the debtors in *Schlehuber* could fund a Chapter 11 plan, the bankruptcy court's order converting their Chapter 7 case to Chapter 11 was affirmed by both the B.A.P. and the Eighth Circuit on appeal.

Here, the relevant considerations are:

- Based on this Court's experience, Chapter 11 individual bankruptcy cases are both complicated and expensive; typical attorney fees and expenses for individual Chapter 11s average $20,000 or more; typically, experienced Chapter 11 lawyers charge higher hourly rates than Chapter 7 consumer lawyers, reflecting the higher level of skill, knowledge, risk, and expertise required for Chapter 11s.

- Attorney fees, as administrative expenses of the estate, must be paid in full as of the effective date, unless the holder of the claim agrees to different treatment. *See* § 1129(a)(9).

- Likewise, expenses in a Chapter 11 are higher, as reflected both in the much higher filing fee plus the copy and mailing expense required to mail plans, disclosure statements, ballots and other required mailings to all creditors under Rule 2002; in addition, Chapter 11 debtors pay a quarterly fee based on disbursements to the United States Trustee under 28 U.S.C. § 1930.

- Confirming an individual Chapter 11 plan of reorganization is not necessarily a "slam-dunk" process. Generally speaking, in Chapter 11, a debtor has the burden to prove that all the provisions of § 1129(a) are established, including the feasibility requirement of § 1129(a)(11).

- Other § 1129(a) requirements include that the plan must classify classes of creditors, and "impaired classes" must vote to accept the plan if it is to be confirmed. *See* §§

1124; 1129(a)(8), (a)(10). If impaired creditor classes do not vote to accept the plan, the plan may still be confirmed, but only if the plan meets the cramdown provisions of § 1129(b). The "absolute priority rule," as it is known, means effectively that the creditors must be paid in full for the plan to be confirmed; otherwise, all of a debtor's assets, including exempt ones such as cars and household goods, must be liquidated. *E.g., In re Woodward*, 537 B.R. 894 (B.A.P. 8th Cir. 2015) (absolute priority rule applies to individual Chapter 11 cases).

- All unsecured creditors must be classified in the same class, but if classified separately, treatment cannot be discriminatory between classes. *See* §§ 1122, 1123(a)(4); 1129(a)(1); 1129(b).

- The Jameses, as the largest unsecured creditors with the largest vote, would effectively control the class of unsecured creditors. This means, effectively, that unless the Jameses voted in favor of the plan, the plan could not be confirmed and the Chapter 11 case would have to be dismissed or converted. *See* §§ 1126(c), 1112(b)(4)(J).

- Even if the Jameses voted in favor of a potential plan, based on the number of other creditors, there would have to be a number of other creditors who voted in favor or the plan could not be confirmed. *See* § 1126(c).

- Unlike in a Chapter 7 or Chapter 13, if a debtor has scheduled undisputed creditors, they are considered to have an allowed unsecured claim in a Chapter 11 and thus are entitled to a vote. Rule 3018(a).

- The Jameses presented no evidence about whether they would support any Chapter 11 plan; in the absence of that evidence, the Court must presume – given the vehemence

with which they are pursuing the Debtor – that they would not vote to support a Chapter 11 plan unless it paid them 100% of their claim. Since any plan could not discriminate in treatment against the other unsecured creditors, the plan would have to propose to pay the Debtor's approximately $163,000 in unsecured claims ($145,000 for the Jameses' claim plus the $18,000 of other unsecured claims) in full.

- Realistically, if the Debtor were to propose a Chapter 11 plan, she would be required to pay $190,000 to $200,000 to her creditors, after considering the $163,000 in unsecured claims, plus administrative fees and expenses. Assuming the Debtor continues to have $500 to $600 in projected disposable income, it would nonetheless take her more than 30 years to pay her debts and administrative expenses in full under a Chapter 11 plan (*e.g.*, $190,000 divided by $500/mo. = 380/mos.; 380 mos. divided by twelve = 31.6 years).

- The Debtor has no other assets except exempt assets to fund a Chapter 11 plan and although she has a good job, as a woman in her 60s, she cannot be expected to work another thirty years.

- In the alternative, it is not even clear that what the Jameses suggested in their Amended Motion – a Chapter 11 plan devoting all disposable income for five years – could be confirmable under these circumstances; the Debtor will likely need another car within the next five years and may face other increased living expenses. Unlike in a Chapter 13, in an individual Chapter 11 case, the debtor must complete all payments and demonstrate she devoted all disposable income during the Chapter 11 before receiving a discharge; there may be disputes about whether all disposable income was paid. § 1141(d)(5)(A).

29

- Conversely, the Chapter 7 Trustee in this case has opened an asset case; there was no evidence about how much money she has collected (although there was some argument of counsel); but the Court can take judicial notice of the fact that the Chapter 7 Trustee requested issuance of a bar date, meaning that she intends to collect or has collected assets. Also, the Court may take judicial notice of the Chapter 7 Trustee's "strong arm powers" to collect assets, such as the payments the Jameses received under their garnishment within the preference period of § 547(b), for the benefit of all creditors.

- In a Chapter 11, the Debtor would be considered the trustee with strong arm powers and the power to sue the Jameses to the extent they received preferential or other avoidable transfers under § 547(b) [see § 1107]; it is not clear that it would be in the best interests of the estate for the Debtor acting as her own trustee to sue the Jameses, however, given the litigious relationship exhibited thus far.

### Conclusion as to § 706(b) Conversion to Chapter 11

The Court believes that this case is not at all similar to *Schlehuber*. Rather, there is no evidence here that converting this case to a Chapter 11 would be in the best interests of the estate and other parties in interest, or that the Debtor could even propound a confirmable Chapter 11 plan. In sum, the Court concludes that the Jameses failed to meet their burden of proof under § 706(b) to convert the case to a Chapter 11; likewise, the Court declines to exercise the discretion granted it under § 706(b) and the *Schlehuber* case to convert this case to a Chapter 11. Count II of the Amended Motion is therefore denied.

III.    *Count 3: Motion to Convert to Chapter 13*

Count III of the Jameses' Motion requests, in the alternative, that the Court convert the

Debtor's case to a Chapter 13. The Court denies the request, for the following reasons.

It is undisputed that at the time the Debtor filed bankruptcy, she was not eligible for a

Chapter 13 given that her debts exceeded the debt limits of § 109(e).  The Jameses added Count

III after the state court reduced the judgment to $145,000. They argue that since a portion of their

original judgment is void, that portion of the judgment never existed, such that the Debtor should

be deemed eligible for conversion to Chapter 13 as of the date she filed bankruptcy. For the

reasons set forth below, the Court disagrees.

Section 109(e) provides in relevant part that "[o]nly an individual with regular income

that owes, *on the date of the filing of the petition*, noncontingent, liquidated, unsecured debts of

less than $383,175 . . . may be a debtor under chapter 13 of this title." (emphasis added).

Numerous events may occur postpetition to affect a debtor's total secured or unsecured

debt. Collateral may be liquidated, converting a secured claim to an unsecured deficiency claim.

Contingent personal guaranties may be liquidated after the creditor pursues a co-debtor, surety,

or principal. A creditor may file a postpetition claim treated under the Code as prepetition, such

as a lease rejection claim under § 365(g) or a § 1305 claim. Or, as was the case here, a judgment

might be modified or vacated by the trial court that issued the judgment or  later on appeal.

 The majority of courts that have considered the effect of a postpetition event on

eligibility to file (or be converted) to Chapter 13 have concluded that postpetition events should

not be considered in determining eligibility. To hold otherwise would mean that a debtor could

float in and out of Chapter 13 eligibility during the course of a case, depending on what happens,

which of course makes no legal or practical sense.

31

The Court thus agrees with the majority of courts that the plain language of § 109(e) requires consideration of the debts as they exist as of the petition date, irrespective of postpetition events.[10] *E.g.*, *In re Wiencko,* 275 B.R. 772 (Bankr. W.D. Va. 2002); *In re Slack*, 187 F.3d 1070 (9th Cir. 1999); *In re Snell*, 227 B.R. 127 (Bankr. S.D. Ohio 1998); *In re Harwood*, 519 B.R. 535, 539–40 (Bankr. N.D. Cal. 2014); *In re Pearson*, 773 F.2d 751, 758 (6th Cir. 1985) ("[T]he fact that some later resolution of the conflict might render more certain the precise nature of the debt itself . . . is relatively immaterial in determining the debtors' financial condition and Chapter 13 eligibility on the date the petition is filed. . .. We do not believe that the statute requires any more" than a realistic look at "the state of the debtors' affairs" on the petition date). The fact that Missouri law might treat a voided judgment differently is simply not relevant to the meaning of § 109(e).

For the reason that the Debtor was not eligible to file a Chapter 13 on the date of filing of her petition, the Court concludes that Count III should be denied.

The Jameses' Amended Motion to Dismiss or Convert is thus denied *in toto* and a separate written judgment will issue.

## Part II: Complaint to Determine Dischargeability

The Jameses timely filed a 3-count complaint against the Debtor, seeking to except from discharge their judgment debt, under § 523(a)(2)(A), (a)(2)(B), and (a)(6). The Court has previously found jurisdiction and is ready to rule.

---

[10]    The other issue that arises when considering the Chapter 13 debt limits under § 109(e) is whether a court is limited to considering the debts as listed on the schedules or whether a court may look at other evidence besides the schedules. That is the not the issue in this case, and the Court expresses no opinion about the split of authority on that issue.

### *Findings of Fact*

The Court incorporates the previous findings of fact in Part I of this Opinion, and in the interests of expediency, restates and adds to them where relevant in narrative form now that many of the facts have been established.

Knowles had lived with the Debtor for 10 years. He helped her with the small karate business she ran and set up an email account for the business. Debtor and Knowles discussed Debtor's retirement, and decided that they should open a B&B together. For reasons that are not clear, the Debtor, as the sole buyer, signed an exclusive buyer agency contract with Chartwell Realty as broker and Strong as realtor on April 1, 2013. Email exhibits show that the Debtor emailed certain real estate listings to Strong and that they toured several properties.

Within a few days, Strong, Knowles, and the Debtor visited the property located at 24704 Haines Road in Greenwood, Missouri (the "Property"). On April 6, 2013, the Debtor, as the sole buying party, and Strong, as her agent, signed the Contract, offering to purchase the Property from the Jameses for the purchase price of $999,500. The Contract provided for an all-cash sale. There was no financing contingency clause in the Contract. Paragraph 7 of the Contract provided that because it was a cash sale, the Debtor was required to provide written verification from a depository of funds within 5 calendar days of funds sufficient to complete the closing. Any changes had to be agreed to in writing by both parties no later than 15 days before closing. Paragraph 19 provided that upon acceptance of the Contract, the $10,000 earnest money was to be deposited with Thomson Affinity Title within 10 banking days. The Contract provided for closing on May 2, 2013 and possession on May 3, 2013, and time was of the essence.

On April 8, 2013, Strong received a letter via email, purporting to provide proof of funds from Tailwind Funding, LLC on behalf of the Debtor for the full purchase price of the Property

(the "Letter"). The Letter purports to be from and is signed by one Brian J. Meidam, Funding

Manager for Tailwind Funding, LLC. The Letter is dated April 8, 2013, and the evidence shows

that the Jameses received the Letter the same day. The Letter reads:

> To Whom It May Concern:
>
> This letter is to confirm that Tailwind Funding, LLC is willing to provide funding
> for the requested purchase price to Sharon West in an amount up to $999,500 for
> the purchase of 24704 E. Haines Road Greenwood, Mo.. [sic] Funds are available
> to close on the subject property on behalf of Sharon West. Funding is subject to
> our complete review of the transaction and Tailwind Funding, LLC reserves the
> right to amend or add any requirements or loan conditions as it chooses in its sole
> discretion.
>
> Please feel free to contact us if you have any questions or need any additional
> information.

A copy of the Letter is attached to this Opinion.

Although Strong originally testified that Debtor provided him the Letter, he later

admitted that he had no knowledge or proof that she sent it to him. Knowles testified that he sent

the Letter to Strong, and this Court finds Knowles did in fact create and send the Letter. Knowles

testified he generated the Letter from the internet by plugging in the relevant information, such

as the address and purchase price. Upon receipt, Strong passed the Letter on to Greg Duncan, the

buyer's agent, who then passed it on to the Jameses. Both Strong and Randy James testified that

nothing about the Letter looked unusual.

The Debtor did not provide the proof of funds or pay the earnest money. In the next few

weeks, there were several communications between Strong, Duncan, and the Title Company

regarding the lack of the earnest money deposit. On May 2, the Debtor failed to show up for the

closing, and the Jameses rescheduled the closing for May 6.

On May 7, Knowles sent an email to Brant Elsberry at Chartwell Realty. The email

sender was listed as "Sharon West," and the email address was "Westk4k@gmail.com." The

Debtor testified, however, that Knowles created the account for her karate business and that she did not have access to it. Knowles confirmed the Debtor did not have access, and further testified to sending the email. Strong likewise testified that Knowles, not the Debtor, sent the email. This Court finds that Knowles sent the email.

The email contained a cashier's check image as an attachment (the "Check"), in the amount of $989,500. The Check purported to be from Banner Bank as payor. Knowles testified he found the Check image from an internet search, and that there was never an actual check. Exhibit 29 shows Brant Elsberry passed the Check to Duncan, who passed it on to the Jameses. Upon receiving the Check, Strong testified the lack of an account number and routing number raised red flags and that he suspected the Check was a fake. As a result, Strong ceased communications with the Debtor and Knowles. Randy James testified that he received the image of the check from Duncan and immediately realized that the transaction was a "scam."

Strong testified that throughout the home buying process, he thought Knowles was married to the Debtor. He treated them as one unit. When pressed, however, Strong admitted he had always just "assumed" they were married, and there is no evidence he asked or the Debtor or Knowles ever told Strong they were married. Based on this evidence, the Court finds there was never an explicit representation the Debtor and Knowles were married.

Strong further testified he thought either the Debtor or Knowles had a large "fund or estate" sufficient to cover the purchase price, but could not say who told him that. There is no evidence this statement ever reached the Jameses, either through Duncan, Strong, the Debtor or Knowles. Generally, the evidence from Strong and the Debtor indicated that Strong dealt with the Debtor early on in the process, such as when they were lining up houses to tour. As they got further into the home-buying process, however, Strong communicated primarily, if not

exclusively, with Knowles. Based on this testimony, this Court finds that if the representation about the large estate was made at all (which the Court is not convinced it was), it was made by Knowles, and not the Debtor.

The Debtor testified that she believed Knowles would obtain funding for the purchase price from either his brother or one of his brother's friends or associates. Knowles corroborated this testimony, and further testified he planned to pay back the loan from the revenue of the planned B&B. This Court finds the Debtor held an honest belief that Knowles would secure the funding, and that the Debtor intended to perform fully under the Contract when she signed it. This Court does not accept the Jameses' argument that the Debtor entered into the Contract without any desire to perform as some part of a fraudulent scheme to get a free house.[11]

The Court will make further factual findings as they become relevant to the specific counts and alleged representations here at issue.

### Introduction to the Arguments

In their opening and closing arguments, the Jameses argued that the Debtor is a "smart and sophisticated lady" in part based on her business history with the karate school, and that this is evidence of the Debtor's fraudulent intent. In their complaint, the Jameses allege that nine separate representations are fraudulent. The nine alleged representations are:

(1) The Debtor's representation by signing the real estate contract that she intended to purchase the Property;

(2) The Debtor's representation by signing the real estate contract that she would comply with the entirety of the Contract;

---

[11]     Paragraph 8 of the Contract provides that the Jameses will provide possession when all the documents and funds have been executed and delivered into escrow with the title company.

(3) The Debtor's representation in the contract that she had $999,500 in cash to purchase the Property;

(4) The Debtor's representation that she would close on the dates in the Contract;

(5) The Debtor's representation in the Contract that she would take possession on May 3, 2013;

(6) The Debtor's representation that she was approved by Tailwind Funding for $999,500;

(7) The Debtor's representation that she had $989,500 available from Banner Bank to purchase the Property;

(8) The Debtor's representation that she was married to Knowles; and

(9) The Debtor's representation that she had a large estate or fund sufficient to pay the purchase price.

The Jameses allege that the Debtor made representations one through five by signing the Contract; that she made representations six and seven through the Letter and Check emails; and that she made representations eight and nine orally. In support of these alleged misrepresentations, the Jameses argue that both Knowles and Strong were the Debtor's agents, and that Knowles and the Debtor were engaged in a joint enterprise to purchase the Property.

The trial was originally scheduled based on the assurances of the parties that trial would require half of a day. At the conclusion of the first full day of trial, the Court advised counsel on the record of various legal issues it was having difficulty with and asked counsel to address those issues at closing or in the form of additional legal citations. Both counsel provided additional legal citations that the Court read into the record at the start of the second day of trial.

On the second day of trial, the Jameses argued and adduced evidence in support of a theory that the Debtor "obtained" something by the failed real estate transaction, such as (1) the intangible right to buy the property (*i.e.,* equitable title), and (2) the services the Jameses performed or paid for on the Property, such as home maintenance and utilities, which they argue they were required under the Contract to provide until the sale closed. This evidence was outside the scope of the complaint, which did not allege that the Debtor had obtained money, property, or services from the Jameses, but was admitted with no objection.

In response, the Debtor denies making all of the alleged fraudulent misrepresentations. During her motion for judgment as a matter of law, and again at closing, the Debtor argued she obtained nothing, and thus relief under both § 523(a)(2)(A) and (a)(2)(B) are inappropriate. In closing, the Debtor asked this Court to award her judgment, and – for the first time – asked this Court to award her costs and attorney fees under § 523(d) and Rule 7054. In furtherance of this request, the Debtor asked this Court to award her judgment and hold the matter open for fourteen days so the Debtor could file a fee motion under Fed. R. Civ. P. 54(d)(2).

### *Conclusions of Law*

#### *Section 523(a)(2)(A) & (B)*

Section 523(a)(2) reads in pertinent part:

(**a**) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
    (**2**) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
        (**A**) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]
        (**B**) use of a statement in writing--
            (**i**) that is materially false;
            (**ii**) respecting the debtor's or an insider's financial condition;

> **(iii)** on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; **and**
>
> **(iv)** that the debtor caused to be made or published with intent to deceive.

The two grounds for nondischargeability under subsections (2)(A) and (2)(B) are mutually exclusive. *In re Long*, 774 F.2d 875, 877 n.1 (8th Cir. 1985).

### Before Reaching Counts I and II, Threshold Issues of Law

There are three threshold issues of law under § 523(a)(2) applicable to both Counts I and II. First, is the Jameses' debt a debt for money, property or services "obtained by" fraud under either § 523(a)(2)(A) or (a)(2)(B)? Second, should misrepresentations made by someone other than the Debtor be imputed to her under § 523(a)(2)(A) or (a)(2)(B)? Third, do the alleged misrepresentations fall under § 523(a)(2)(A) or (a)(2)(B)?

### Threshold Issue No. 1 – What "Money, Property or Services" Did the Debtor Obtain From the Jameses?

The first issue is whether the complaint states a plausible claim for relief under § 523(a)(2); that is, whether the Debtor obtained "money, property or services" from the Jameses. The Debtor moved to dismiss the Jameses' complaint for failure to state a claim in her answer and moved for judgment on the pleadings at the close of the Jameses' evidence. The issue is a real one; the majority of § 523(a)(2) cases involve someone misrepresenting something to someone else to obtain something: a vehicle, a loan, or a business interest, for example. Here, the Debtor arguably obtained nothing from the Jameses. In fact, the Jameses later sold the Property to an unknown party for $735,000. The Court must therefore delve into what "obtained by" means in the context of § 523(a)(2)(A) and (B) before reaching the merits.

The case law is convoluted. Before the Supreme Court's decision in *Cohen v. de la Cruz*, 523 U.S. 213 (1998), there were three lines of cases: (1) those requiring debtors to receive a

personal and direct benefit from their fraud; (2) those requiring debtors to at least receive an indirect benefit from their fraud (known as the "receipt of benefits" theory); and (3) those not requiring the plaintiff to show any benefit to the debtor, whether direct or indirect. *See, e.g., In re Bilzerian*, 100 F.3d 886, 890 (11th Cir. 1996) (describing the three approaches). This Court did not find any Eighth Circuit cases addressing this split before the *Cohen* case, and the parties did not cite any.

It is now clear after the *Cohen* decision, however, that "[t]o the extent obtained by" qualifies "money," and not "any debt." *Cohen*, 523 U.S. at 218–19. Following *Cohen*, at least three circuits have done away with the requirement that the debtor receive at least some benefit. *In re Yelverton*, No. 09-00414, 2009 WL 3823187, at *2–*3 (Bankr. D.D.C. Nov. 16, 2009) (citing post-*Cohen* cases from the Fourth, Fifth, and Ninth Circuits, rejecting the receipt-of-benefits test); *see also In re Reuter*, 427 B.R. 727, 746 (Bankr. W.D. Mo. 2010). What is still unclear is whether a benefit to at least a third party is required. *See, e.g., Yelverton*, 2009 WL 3823187, at *2–3 (requiring at minimum that "someone or something received property"). Again, there is no controlling Eighth Circuit law post-*Cohen*.

*Cohen* certainly liberalized the "obtained by" language in § 523(a)(2). However, the cases adopting this approach generally analyze the "obtained by" language where the real issue is whether a *third party's* receipt of benefits is sufficient. This Court is not aware of any other Courts, even after *Cohen*, finding nondischargeability where no one, not even a third party, obtained some kind of benefit from the alleged misrepresentation.

As explained above, the Jameses argue the Debtor obtained bare equitable title to the Property when they accepted the Contract and that she obtained their services to maintain the Property. There is no evidence that any third party received a benefit here, so the Jameses

essentially ask this Court to either find that (1) the Debtor received a benefit under one of their theories, or (2) *Cohen* expanded the scope of § 523(a)(2) such that it is not necessary that any party receive a benefit.

The issue has been further muddied by the Supreme Court's recent ruling in *Husky International Electronics, Inc. v. Ritz*, 136 S. Ct. 1581 (2016), which some commentators have read to mean that a fraudulent scheme is all that is sufficient for nondischargeability under § 523(a)(2)(A). *But see In re Vanwinkle*, Adv. No. 16-5030, 2016 WL 7443168 (Bankr. E.D. Ky. Jan. 31, 2017) (reading *Husky* to say that only a debt obtained by actual fraud is nondischargeable under § 523(a)(2)(A) on the basis of fraud, and rejecting the creditor's argument that the judgment debt that was not based on fraud should be actionable under § 523(a)(2)(A) because the debtor engaged in a post-judgment fraudulent conveyance scheme that had nothing to do with the creation of the debt itself).

Given this convoluted state of the law and the facts of this case, the Court believes it is a far stretch to say that the Debtor "obtained" utility or maintenance services from the Jameses when the Jameses would have incurred them regardless of whether or not they entered the Contract with the Debtor. Certainly, the moving costs and other damages were not obtained by the Debtor. Any property "obtained" under the Contract would have expired once the sale did not close. Nonetheless, a right to close such as the Debtor obtained once the Jameses accepted her offer to purchase is in the nature of an equitable property interest under applicable Missouri law. The Court will therefore conclude that the Debtor obtained a property interest from the Jameses, such that the Jameses have pleaded a plausible claim for relief under § 523(a)(2)(A) and (B), and deny the Debtor's motion for judgment on the pleadings on this ground.

***Threshold Issue No. 2: Should Fraudulent Statements of Knowles or Strong Be Imputed to the Debtor on the Grounds of Agency?***

The second threshold issue is that of agency. The weight of the evidence shows that many of the alleged misrepresentations to the Jameses were not made by the Debtor herself, but by either her boyfriend Knowles or by her agent Strong based on communications from Knowles.

The Supreme Court has recognized that a court may impute fraud to a debtor-principal in a nondischargeability proceeding. *In re Miller*, 276 F.3d 424, 429 (8th Cir. 2002) (citing *Strang v. Bradner*, 114 U.S. 555, 561 (1885)). The imputation is based on agency principles. The Eighth Circuit has likewise recognized that a bankruptcy court may impute an agent's fraud to his debtor-principal. *See Matter of Walker*, 726 F.2d 452, 454 (8th Cir. 1984); *In re Treadwell*, 637 F.3d 855, 860 (8th Cir. 2011).

Two prerequisites must exist, however, before imputing an agent's fraud to a principal: an agency relationship and knowledge of the fraud.

***Prerequisite No. 1 to Imputation: Agency Relationship***

Generally, to establish a principal-agent relationship under Missouri law, the principal must have a "right to control" the agent. *Bach v. Winfield-Foley Fire Protection Dist.,* 257 S.W.3d 605, 608 (Mo. 2008). The mere existence of a marital relationship – and presumably that of boyfriend/girlfriend – is insufficient to establish a principal-agent relationship. *See, e.g., Missouri Farmers Ass'n, Inc. v. Busse*, 767 S.W.2d 108, 110 (Mo. Ct. App. 1989). An implied agency can exist, however, where the significant other's activity amounts to "joint participation." *Kenny's Tile & Floor Covering, Inc. v. Curry*, 681 S.W.2d 461, 466–67 (Mo. Ct. App. 1984); *Busse*, 767 S.W.2d at 110. "Joint participation has been demonstrated by knowledge and active involvement in the project undertaken." *Turner v. Hoffmeier*, 690 S.W.2d 188, 189 (Mo. Ct.

42

App. 1985) (citing *Robinson Lumber Co. v. Lowrey*, 276 S.W.2d 636, 640–41 (Mo. Ct. App. 1955)).

Whether an agency relationship exists is a matter of state law. *In re Reuter*, 686 F.3d 511, 517 (8th Cir. 2012).

Here, both the Debtor and Knowles testified that they were in the B&B project together, intending to each have specific duties and sharing any profits. The Debtor also testified that she left the details of the Property purchase and the financing to Knowles. The Court concludes that the Debtor and Knowles had, at a minimum, a joint venture, such that Knowles was her agent for purposes of imputing his representations to her.

With respect to Strong's agency, the relationship between a homebuyer and a buyer's agent is addressed by statute. In Missouri, buyer's real estate agents are licensed under state law. *See* § 339.710 RSMo *et seq.* Section 339.740 clearly states that a buyer's agent is a limited agent. The statute also lays out the agent's duties and obligations. Most importantly, "[a] licensee acting as a buyer's agent . . . owes no duty or obligation to a customer" except to disclose all adverse material facts." § 339.740.3 RSMo. Further, "[a] buyer's agent owes no duty to conduct an independent investigation of the client's financial condition for the benefit of the customer and owes no duty to independently verify the accuracy or completeness of statements made by the client or any independent inspector." *Id.* Here, "customer" refers to the Jameses, and "client" refers to the Debtor. *See* § 339.710(5), (6), (10) RSMo. Thus, Strong may have been an agent of the Debtor's, but only for limited purposes as reflected by the statute and his contract.

### Prerequisite No. 2 to Imputation: Actual or Constructive Knowledge of the Agent's Fraud

Once an agency relationship is established, as it has been here, the second prerequisite for imputation is that the debtor as principal had actual or constructive knowledge of the agent's

fraud. This means the debtor knew or should have known of the agent's fraud. *Treadwell*, 637 B.R. at 860 (citation omitted). Reckless indifference is sufficient to show constructive knowledge of the fraud. *Id.* Actual or constructive knowledge of the fraud is a question of fact. *Walker*, 726 F.2d at 454.

Here, five of the nine alleged representations come from the Debtor's mere act of signing the Contract. Because the Debtor was the sole buyer on the Contract, the alleged representations, if made, came from her, and not from her agent. Thus, imputation is unnecessary as to these five representations. With the remaining representations, the Court must decide as it addresses each representation whether it was made with the intent to deceive, and after determining so, will then address whether that intent should be imputed to the Debtor. So, further imputation issues will be addressed below.

### Threshold Issue No. 3: Which Representations Relate to Financial Condition?

The Jameses pleaded many of the alleged misrepresentations as constituting both fraudulent representations under § 523(a)(2)(A) and fraudulent representations under § 523(a)(2)(B). Since the subsections are mutually exclusive, the Court must address which of the nine alleged representations fall within which section.

Some bankruptcy courts have confined the term "statements" to formal financial statements. But in the Eighth Circuit, "statements regarding financial condition" are construed more broadly. *See In re McCleary*, 284 B.R. 876, 883 (Bankr. N.D. Iowa 2002).

In the Eighth Circuit, a statement regarding the debtor's financial condition is "sufficiently broad enough to include any statement made by the Debtor, not just formal financial statements and documents in a bank or commercial setting." *In re Kerbaugh*, 162 B.R. 255, 261 (Bankr. D.N.D. 1993) (citation omitted). A statement is about the debtor's "financial

condition" if it "concern[s] the debtor's or insider's overall financial health, net worth, or ability to generate income." *Kloven v. Ramsey*, No. 4-92-CV-1249, 1993 WL 181309, at *2 (D. Minn. April 22, 1993). Thus, even misrepresentations about the value of inventory may qualify as statements regarding financial condition. *See Long*, 774 F.2d at 877 n.1.

Here, the Jameses allege nine misrepresentations. Five of them are completely unrelated to the Debtor's overall financial condition, and will be analyzed exclusively under section 523(a)(2)(A). These statements are: (1) the Debtor's representation that she intended to purchase the Property; (2) the Debtor's representation that she would comply with the entirety of the Contract; (3) the Debtor's representation that she would close on the dates in the Contract; (4) the Debtor's representation that she would take possession on May 3, 2013; and (5) the Debtor's representation that she was married to Knowles.

The remaining four statements arguably relate to the Debtor's financial condition under the Eighth Circuit's comparatively liberal standard. The statements are: (1) the Debtor's representation that she had $999,500 in cash to purchase the property; (2) the Debtor's representation that she was approved by Tailwind Funding for $999,500; (3) the Debtor's representation that she had $989,500 available from Banner Bank to purchase the Property; and (4) the Debtor's representation that she had a large estate sufficient to pay the purchase price. These statements will be analyzed under both § 523(a)(2)(A) and (a)(2)(B), given the uncertainty with respect to which they are pled and which subsection they fall within.

### Count I: Section 523(a)(2)(A)

Turning finally to the requirements of § 523(a)(2)(A), the plaintiff must show by a preponderance of the evidence the following five elements:

(1) The debtor [or agent] made a representation;
(2) The debtor [or agent] knew the representation was false at the time it was made;
(3) The representation was deliberately made for the purpose of deceiving the creditor;
(4) The creditor justifiably relied on the representation; [and]
(5) The creditor sustained the alleged loss as the proximate result of the representation having been made.

*In re Freier*, 604 F.3d 583, 587 (8th Cir. 2010) (citing *In re Mauer*, 256 B.R. 495, 500 (B.A.P. 8th Cir. 2000)).

### First Element: Representation

The first requirement is that the debtor or her agent made a representation. Silence regarding a material fact may suffice for a representation. *In re Moen,* 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999). Also, "representation" is not confined to spoken or written words, but also encompasses other conduct that amounts to an assertion inconsistent with the truth. *Id.* (citation omitted). A statement in a contract may constitute a representation for purposes of section 523(a)(2)(A). *See, e.g., In re Smith*, 281 B.R. 613 (Bankr. W.D. Penn. 2002).

### Second Element: Knowledge of Falsity or Reckless Disregard of the Truth

As to the second requirement, that the debtor or her agent knew the representation was false when she made it, it is sufficient if the declarant made the statement not knowing of its falsity but with a reckless disregard for the truth of the statement. *Moen,* 238 B.R. at 791. In determining whether the declarant knew the representation was false when it was made, the court may consider the knowledge and experience of the declarant. *Id.*

### Third Element: Intent to Deceive

The third requirement is intent to deceive. Because direct evidence of intent is rare, a court may accept surrounding circumstances that create an inference of an intent to deceive the creditor. *In re Schnuelle*, 441 B.R. 616, 622 (B.A.P. 8th Cir. 2011). When the creditor introduces

this circumstantial evidence of intent, the declarant's self-serving statement of honest intent is not enough to overcome the inference of intent. *Id.*

### Fourth Element: Justifiable Reliance

The fourth requirement is justifiable reliance. In *Field v. Mans*, 516 US 59, 73–74 (1995), the Supreme Court held that § 523(a)(2)(A) requires justifiable reliance, but not necessarily the reasonable reliance required under (a)(2)(B). The Court noted that "reasonable reliance" is a more stringent standard than "justifiable reliance." *Id.* at 77. Justifiable reliance is a subjective standard. *In re Schmank*, 535 B.R. 243, 258 (Bankr. E.D. Tenn. 2015) (citation omitted). Justifiable reliance falls somewhere between actual reliance and reasonable reliance; even if an investigation would have revealed the falsity of the representation, reliance can still be justifiable. *Schnuelle*, 441 B.R. at 622–23. What is *not* justifiable is blind reliance where a cursory examination would have revealed the falsity of the representation. *Id.*

### Fifth Element: Proximate Cause

The fifth requirement is proximate cause. Proximate cause requires that the creditor would not have suffered the loss at issue but for the debtor's (or her agent's) actions. *In re Maier*, 38 B.R. 231, 233 (Bankr. D. Minn. 1984). It also requires the creditors to prove that their loss was a foreseeable result of the misrepresentation. *In re Smithson*, 372 B.R. 913, 922 (Bankr. E.D. Mo. 2007) (citing *In re Creta*, 271 B.R. 214, 219 (B.A.P. 1st Cir. 2002)).

Addressing each alleged representation in turn:

### The Debtor's Alleged Representation No. 1 That She Intended to Purchase the Property

The Court assumes in the absence of any authority to the contrary that making an offer to purchase in a written contract is a representation that the Debtor intended to purchase the

47

property – the first element of § 523(a)(2)(A). The question is whether the Debtor knew that the representation was false or had reckless disregard for its truth.

The Court believes the Debtor's credible testimony that she thought at the time she made the offer to purchase the Property that Knowles was going to procure the funds for the Contract, and therefore concludes this representation was not overtly false. That does not, however, end the inquiry; it is a closer question about whether signing the Contract in reliance on her boyfriend was made in reckless disregard of the truth.  Certainly, with the benefit of hindsight, her reliance on her boyfriend – now known to be an untrustworthy person – to procure $1.0 million of funds from a rich brother and friend whom she had not met seems far-fetched. It is unclear to the Court whether there was ever valid interest by the brother to help with the funding, or whether Knowles invented the brother's interest and lied to the Debtor from the inception.

But the Court believes that the Debtor honestly believed and trusted her boyfriend, and likewise believes it is unfair to judge her intent and reliance with the benefit of 20/20 hindsight. The Court believes she would not have signed the Contract if she had known Knowles' brother intended not to advance the funds to purchase the B&B. The Court thus finds that the Jameses have failed to meet their burden to prove that the Debtor knew when she signed the Contract that the representation that she was willing to close was made with reckless disregard of the truth.

The third element is whether the representation was deliberately made with the intent to deceive. Again, the Court does not believe that the Debtor engaged a buyer's agent, looked at several houses, and then deliberately picked the Jameses, whom she did not know, to make an offer to buy their house with the intent not to perform. The Court believes her credible testimony that she would not have made the offer if she had known that Knowles could not procure the

funds to close, and that she reasonably believed Strong when he said that if the earnest money was not paid timely the Contract was void in any event.

The fourth element is whether the creditor justifiably relied on the representation. The Court finds that the Jameses justifiably relied on an offer to buy their home. Strong, an otherwise reputable real estate agent, used a standard real estate contract and passed the offer to the Jameses' own agent.

The fifth element is whether the creditor sustained the loss as the proximate cause of the representation being made. The Court confesses to some difficulty with the proximate cause element here. It is true that the default clause of the contract in Paragraph 14 states that: "Seller or Buyer will be in default under this contract if either fails to comply with any material covenant, agreement or obligation with any time limits required by this contract," and that if the Buyer defaults, the Seller may either retain the earnest money or "pursue any other remedy and damages available at law or in equity."

The effective date of the Contract according to its terms was April 9, 2013, when the Jameses signed it. Under the Contract's plain terms, the Debtor defaulted on the Contract when she failed to comply with the first material obligation in Paragraph 7 "to provide written verification from a depository of funds on deposit within 5 calendar days which are sufficient to complete the closing the contract" – in other words, by April 14, 2013. Although the Jameses have argued that they relied on the Letter as the proof of funds, they admitted they relied on the Letter before they signed the Contract – meaning that the Letter could not have served as the "written verification from a depository of funds."

More importantly, the Letter is not from a "depository of funds on deposit," but from an entity evidencing an intent to make a loan.  Even if the Letter could be stretched to constitute

"written verification from a depository of funds on deposit," the Contract also provided in Paragraph 19, "that upon acceptance of this Contract, unless otherwise agreed, any Earnest Money will be deposited within . . . 10 banking days (if MO property)." Here, ten banking days would have been April 23, 2013.

So, at the earliest, the Debtor was in default of the Contract as early as April 14 and no later than April 23. Although the Court is bound to accept the state court's final judgment as to the amount of damages, the Court has exclusive jurisdiction over whether a debt is nondischargeable, and must therefore question how damages incurred after the April 14 default were proximately caused by any actual representations of the Debtor.

Had the Jameses met their burden of proof with respect to all five elements, the Court might have felt the need to apportion the damages proximately caused by the representation based on the evidence, but since the Court concludes that the Jameses failed to meet their burden of proof with respect to the second and third elements of § 523(a)(2)(A), there is no need to apportion.  The Court denies judgment under § 523(a)(2)(A)  with respect to the representation that the Debtor would close.

### *The Debtor's Alleged Representation No. 2 That She Would Comply With the Entirety of the Contract*

The Court believes that the same analysis and findings apply to this element. Debtor did make a representation that she would comply with all the terms of the Contract; the representation was not false or made with reckless disregard for the truth at the time it was made based on her credible testimony; she did not intend to deliberately deceive the Jameses; the Jameses justifiably relied on the representation she would comply; not all the damages were proximately caused by the reliance, but the Court need not apportion which damages were

caused by the reliance since the Jameses did not meet their burden of proof on all five elements with respect to this representation.

### The Debtor's Alleged Representation No. 3 That She Had $999,500 in Cash to Purchase the Property

The first element is whether the Debtor made a representation that she had $999,500 in cash to purchase the Property. The Court finds no credible evidence that the Debtor made a representation to the Jameses that she had $999,500 in cash.

First, the Contract does not contain such a representation. The Contract states in Paragraph 7 that the sale is a cash sale and that the buyer must provide written verification from a depository of funds on deposit and that the purchase price must be paid in certified funds on or before closing. Neither of those clauses constitutes a representation that the Debtor had $999,500 in cash.  The Jameses allege that she told Strong she had a large estate or fund, but that is the subject of a separate alleged misrepresentation and not a representation that she had $999,500 in cash when she signed the Contract. There is no other evidence that the Debtor herself or through Knowles or otherwise represented that she had $999,500 in cash.

Moreover, it is generally accepted that buyers may choose the cash sale option when buying real estate even though they intend to secure outside financing. The choice of the cash sale option simply means that the buyer does not have the out of a financing contingency. Cash buyers cannot be said to represent, at the moment of signing the contract, that they have cash equal to the purchase price. Instead, in those transactions, as is the case here, the buyers may be seeking outside financing, some type of gift, or another means of obtaining cash by the closing date. The closing date is the date that the buyer must have the funds available to close under the contract. The Contract at issue does not contain a provision that the Debtor must have cash on

the date of signing, and establishes the closing date as the date she must pay the balance of the purchase price.

Furthermore, construing the Debtor's signature on the Contract as a representation that she had $999,500 in cash would render superfluous the proof of funds provision in the Contract. The proof of funds provision requires the Debtor to provide proof of funds for the contract price within five days of signing the Contract.

Alternatively, even assuming the Debtor represented that she had $999,500 in cash by signing the Contract, for the reasons already discussed, the Court does not find that the Debtor's representation that she could procure the funds was false or was intended to deceive the Jameses. Likewise, the Court cannot find justifiable reliance or proximate cause on the part of the Jameses. The purpose of the proof of funds provision was to ensure the Debtor had sufficient cash to close. Thus, the Jameses were not entitled to rely on the Contract as a representation that the Debtor had sufficient funds – that was the purpose of the proof of funds provision.

In conclusion, as to the representation that the Debtor had $999,500 in cash, the Jameses have failed to show that the Debtor made a representation, that the Jameses justifiably relied on the representation, and that the alleged representation was the proximate cause of their loss. The Court denies judgment under § 523(a)(2)(A)  with respect to the alleged representation that the Debtor had $999,500 in cash.

### The Debtor's Alleged Representation No. 4: That the Debtor Would Close on the Dates in the Contract

The Court incorporates its findings with respect to the previous representations, and finds as follows.  First, by signing the Contract, the Debtor represented that she would close. Second, the Debtor's representation was not false or made with reckless disregard for the truth, because she reasonably relied on Knowles to provide the financing to close. Third, the Debtor

did not make the representation with the deliberate intent to deceive the Jameses. In particular,

the Debtor credibly testified that she believed based on what Strong told her that the Contract

would be void if she did not pay the earnest money. Fourth, the Jameses justifiably relied on the

Debtor's representation in signing the Contract that she would close. But fifth, the intervening

defaults for the failure to provide verification from a depository of funds and payment of the

earnest money mean that the Jameses' damages were not all proximately caused by the

representation. The Court therefore need not apportion the damages caused by the representation

since the Jameses failed to meet their burden of proof with respect to all five elements.

### *Debtor's Alleged Representation No. 5: That She Would Take Possession of the Property on May 3, 2013*

The Court incorporates its findings from the previous representations, and finds that the

Jameses have failed to meet their burden of proof with respect to all but the reliance element.

### *Debtor's Alleged Representation No. 6: That She Was Approved by the Letter for $999,500*

The Letter representation is somewhat different from the other alleged representations. It

was obviously (1) a representation; (2) that was false; and (3) that was deliberately made with the

purpose of deceiving the Jameses. This representation could be a representation under §

523(a)(2)(A) or a representation regarding financial condition under § 523(a)(2)(B). But since

the first three elements of both sections are essentially the same, the Court will address those

elements first before deciding which Count this representation falls under (and therefore which

standard of reliance applies.) The first issue with this allegation is whether the Debtor made the

representation or whether the representation should be imputed to her.

The Court does not believe that the Debtor was responsible for creating and sending the

Letter.  She testified credibly that she had no knowledge of the Letter at the time it was provided

to Strong, who provided it to the Jameses through their real estate agent. Her testimony was buttressed by Strong's and by Knowles.' Strong ultimately admitted he had no knowledge of who sent him the Letter. Knowles testified he created the Letter with Strong's knowledge and that the Debtor had no knowledge of the Letter. The Court concludes that the Debtor herself did not represent through the Letter that she had the funds to close the loan. But that leaves the question about whether the misrepresentation evidenced by the Letter should be imputed to her.

To recapitulate, to impute Knowles' or Strong's misrepresentation to the Debtor, the Court must find both agency and actual or constructive knowledge of the fraud. Having found agency on the part of Knowles and limited agency on the part of Strong, the Court turns to the Debtor's actual or constructive knowledge of the fraud.

The Court finds that the evidence does not show that the Debtor had actual or constructive knowledge of Knowles' fraud through the Letter. The Court again believes her credible testimony that she was in good faith and based on a long-time relationship of trust and love reasonably relying on her boyfriend to procure the funding for the purchase of the Jameses' home.

But what about Strong? Knowles testified that Strong assisted him in creating the fraudulent Letter. The Court tends to believe that was true, notwithstanding Knowles' otherwise untrustworthy nature, given that Knowles appeared to lack the knowledge or sophistication for creating such a letter.[12] But whether Knowles acting alone or Strong and Knowles together created the Letter, the bottom line is that there is no evidence the Debtor had actual or constructive knowledge of the Letter. The third element is thus not met.

---

[12]        Knowles admittedly had computer and internet sophistication, but there was no evidence he was financially sophisticated.

With respect to the fourth element, justifiable reliance, the Court again is faced with a difficult question. The Jameses each credibly testified that they had no reason to question the validity of the Letter as providing proof that the Debtor had funds sufficient to close the contract, which they assert is what caused them to accept her offer and to sign the Contract to begin with. Although the Court does not doubt their sincere belief, the Court must still question whether their belief was, in some respects, as naive and unrealistic as the Debtor's was.

First, the Letter is not, as the Court has already mentioned, a letter from a depository institution of proof of available funds as the Contract required. It is also not from a standard or recognized funder of residential mortgages. Second, it was not accompanied with the earnest money deposit. Third, it bears no logo or professional letterhead such as would typically be seen of letters of commitment or letters of intent from reputable and well-known funding entities.

Fourth, the Letter does not contain any of the standard terms a reasonable person would expect to see, such as conditions, interest rates, date of closing, expiration, requirements of title, a deed of trust or mortgage, etc. Fifth, assuming the Debtor had represented to the Jameses that she had a fund or estate to finance the purchase, the Letter does not even state it is written on behalf of a fund or estate. Finally, the last sentence discussing terms of a loan are expressly contradictory to the nature of a cash deal.

In short, the fact that the Letter did not comply with the requirements of the Contract and contained no objective indicia of a proof of funds letter should have raised concerns not only from the real estate agents but from a seller who also happened to be an experienced lawyer.

That being said, it is not difficult for the Court to believe that real estate agents on both sides – with motivation to close a deal with a lucrative commission – did not have the incentive to fly-speck the Letter or to raise concerns about its patent red flags. That being said, it is also

not difficult for the Court to believe that the Jameses – who were separated, trying to down-size, and who faced the ongoing upkeep of a very expensive home – likewise had no incentive to fly-speck the Letter or raise concerns. The Property had been on the market for several months, and the Jameses were presumably as anxious, as are all home sellers, to find a buyer and to close.

So, given that the standard under § 523(a)(2)(A) is "justifiable" and not reasonable, as under § (a)(2)(B), to the extent the Letter constitutes a representation under § (a)(2)(A), the Court concludes that the Jameses' reliance on the Letter was justifiable.

With respect to the fifth element, proximate cause, the Court again incorporates its findings that not all of the damages were proximately caused by the representation but that since the Jameses did not meet their burden of proof with respect to all of the elements, the Court need not apportion the damages.

### Alleged Representation No. 7: That The Debtor had $989,500 available from Banner Bank to purchase the Property

The evidence is undisputed that an image of a check from Banner Bank in the amount of $989,500 was sent to the Jameses through their agent by someone at Chartwell Realty. The Court finds and concludes that the Check was a representation; that the representation was false; and that the representation was made with intent to deceive. The issues with this representation are whether the Debtor made the representation or whether it should be imputed to her; whether the Jameses relied on it; and whether the representation proximately caused their loss.

The Court finds based on the credible testimony of the Debtor that she did not create or send the Banner Bank check. The Court's finding is supported by Strong's testimony that at this point in the transaction he was dealing with Knowles and had no personal knowledge that the Debtor sent the check, and Knowles' testimony that he sent the check to Strong. With respect to whether knowledge of the false representation in the form of the check should be imputed to the

Debtor either through Knowles or Strong, the Court incorporates its earlier findings. Knowles was in a joint venture with the Debtor to buy the home, but there is no evidence that she knew or had constructive knowledge of the false check either created by or found on the internet by Knowles, or that he was sending it to Strong and through Strong to the Jameses through their agent.

Strong testified he recognized immediately that the check was false since it had no routing numbers. He (or someone at Chartwell Realty acting on his behalf) therefore did not send it to the Jameses with the intent of deceiving them. Thus the Court concludes that the misrepresentation and intent to deceive of the false check should not be imputed to the Debtor.

More importantly, both the Jameses credibly testified that they immediately recognized the check as being false. It therefore cannot be said that they justifiably relied on the false check or that any of their damages were caused by it.

### *Alleged Representation No. 8: That the Debtor was married to Knowles*

The first element is whether the Debtor made a representation that she was married. The evidence shows that the Debtor did not represent that she was married. The Court believes the Debtor's credible testimony that she did not represent to Strong that she was married. More importantly, the Contract states on page 1 that "This contract is made between: PRINT Names and indicate marital status." The Buyer's name on the Contract is the Debtor's, not the Debtor as a married person. There is likewise no other evidence that the Debtor represented to the Jameses that she was married.

Strong testified that the Debtor and Knowles represented to him that they were married, but the Court cannot believe that was true; if this experienced agent had believed so, he would have made sure that the Contract stated "Sharon West, a married person" – in the same way he

testified that if he had known the purchase was for a B&B he would have made sure he checked the "other" box on his buyer's agency form (indicating he was not merely representing her for the purchase of residential property).

More importantly, assuming the Debtor misrepresented to Strong her marital status, there is no evidence that the Jameses knew the Debtor was married or even relied on that representation. Plus, there is no evidence that the fact she was unmarried was the proximate cause of any of the Jameses' damages.

### *Alleged Representation No. 9: That Debtor had a Large Estate or Fund Sufficient to Pay the Purchase Price*

The final alleged representation is that the Debtor represented that she had a large estate or fund sufficient to pay for the purchase price of the Jameses' home. The first element is whether the Debtor made this representation.

The Court believes the Debtor's credible testimony that she did not represent she had a fund or estate worth $1.0 million. The next issue is whether Knowles or Strong as her agent made the representation such that the representation should be imputed to her. The Court need not reach that issue, however, since there is no evidence that anyone: (1) told the Jameses that the Debtor had access to $1.0 million through an estate or fund or (2) that the Jameses relied on that representation in accepting her offer to buy the Property. Rather, the Jameses' testimony was that they relied on the Letter in accepting the Debtor's offer, not on any representation of the Debtor that she had $1.0 million from an estate or fund.

### *Conclusion as to Count I*

In sum, assuming all nine representations fall within § 523(a)(2)(A), the Court concludes that the Jameses have failed to meet their burden of proving by a preponderance of the evidence

that their debt should be nondischargeable under § 523(a)(2)A) based on any of the nine alleged representations. Judgment will be entered against the Jameses on Count I of their complaint.

### Count II: § 523(A)(2)(B)

The Court turns to Count II, analyzing nondischargeability under § 523(a)(2)(B). As explained previously, the Court will analyze only those four of the six alleged representations that arguably relate to the Debtor's financial condition.

Section 523(a)(2)(B) provides in relevant part that a discharge under section 727:

> does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by use of a statement in writing
> > (i) that is materially false;
> > (ii) respecting the debtor's or an insider's financial condition;
> > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> > (iv) that the debtor caused to be made or published with intent to deceive.

Put another way, § 523(a)(2)(B) requires a creditor to show, by a preponderance of the evidence, these elements:

> (1) the debtor [or agent] made
> (2) a statement in writing
> (3) respecting the debtor's financial condition
> (4) that was materially false and
> (5) that was made with the intent to deceive; and
> (6) that was reasonably relied upon by the [creditors].

*In re Bohr*, 271 B.R. 162, 167 (Bankr. W.D. Mo. 2001); *Grogan v. Garner,* 498 U.S. 279, 286–87 (1991) (preponderance of the evidence standard).

At the threshold, § 523(a)(2)(B) requires the same legal analysis as to whether the debt was for money, property or services "obtained" by the misrepresentation. The Court incorporates its analysis from Count I and concludes that the Debtor obtained a property interest such that her motion for judgment should be denied.

Turning to the elements (and assuming the first element):

### Second Element (Statement in Writing)

The second element requires a statement in writing, which "must have been either signed by the debtor, written or produced by the debtor, or have been adopted and used by the debtor." *Kerbaugh*, 162 B.R. at 261 (citing *In re Mutschler*, 45 B.R. 482, 490 (Bankr. D.N.D. 1984)); *see also* 4 COLLIER ON BANKRUPTCY ¶ 523.08[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

Courts generally construe this requirement rather broadly, and focus their real analysis on whether the written statement relates to the "debtor's financial condition." For this reason, a debtor signing a contract can be said to have made misrepresentations based on the content of the contract. *See, e.g., In re Whitenack*, 235 B.R. 819, 825–27 (Bankr. D.S.C. 1998) (real estate sale contract, general warranty deed, and closing statement found to be "statement[s] in writing" for purposes of § 523(a)(2)(B)); *In re Aman*, 492 B.R. 550 (Bankr. M.D. Fla. 2010) (collection of closing documents, such as the HUD-1, found to be "statement[s] in writing" sufficient to satisfy the "writing" requirement); *but see In re Chew*, 182 B.R. 341, 347 (Bankr. N.D. Ala. 1995) ("Without further evidence, this Court is unable to find that the signing of the lease in question was 'use of a statement in writing' under [§ 523(a)(2)(B)].").

### Third Element: Respecting the Debtor's Financial Condition

The third requirement, that the statement is about the debtor's financial condition, means that the statement "concern[s] the debtor's or insider's *overall* financial health, net worth, or ability to generate income, as opposed to a statement concerning the status or quality of a single asset or liability." *Kloven*, 1993 WL 181309, at *2 (emphasis added); *see also In re Mulder*, 306

B.R. 265, 271 (Bankr. N.D. Iowa 2004) ("The purpose of the statement must be to indicate the debtor's overall financial condition.").

### Fourth Element: Material Falsity

Regarding the fourth requirement, "[a] financial statement is materially false if it paints a substantially untruthful picture of a financial condition by a misrepresentation of the type which would normally affect the decision to grant credit." *In re Asbury*, 441 B.R. 629, 634 (Bankr. W.D. Mo. 2010) (citation and internal quotations omitted). In a broader sense, "[a] financial statement is also materially false if it falsely represents the overall financial condition of the Debtor or has major omissions." *Bohr*, 271 B.R. at 167 (citing *Capital City Bank & Trust v. Kroh (In re Kroh),* 88 B.R. 987, 994 (Bankr. W.D. Mo. 1988)).

### Fifth Element: Intent to Deceive

As far as intent to deceive, "[k]nowledge of the falsity of the information or reckless disregard for the truth satisfies the intent element of § 523(a)(2)(B)" – a "malignant heart" is not required. *Asbury*, 441 B.R. at 634 (citing *Agribank v. Webb (In re Webb)*, 256 B.R. 292, 297 (Bankr. E.D. Ark. 2000)); *see also Bohr*, 271 B.R. at 169.

### Sixth Element: Reasonable Reliance

As far as the sixth and final requirement:

> The determination of the reasonableness of a creditor's reliance is to be made 'in light of the totality of the circumstances.' *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir.1993) (en banc). Among other things, a Court may consider 'whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.'

*First Nat. Bank of Olathe, Kan. v. Pontow*, 111 F.3d 604, 610 (8th Cir. 1997). "Reasonable reliance" is more demanding that "justifiable reliance" under subsection (a)(2)(A). *Field v.*

*Mans*, 516 U.S. at 61. Reasonable reliance is an objective standard. *See In re Braathen*, 364 B.R. 688, 701 (Bankr. D.N.D. 2006).

With these elements in mind, the Court addresses each of the alleged written statements regarding financial condition in turn:

As previously explained, only four of the nine representations arguably relate to the Debtor's financial condition – not the six the complaint alleges. The four relevant representations from the Jameses' complaint are: (1) the Debtor's representation that she had $999,500 in cash to purchase the property; (2) the Debtor's representation that she was approved by Tailwind Funding for $999,500; (3) the Debtor's representation that she had $989,500 available from Banner Bank to purchase the Property; and (4) the Debtor's representation that she had a large estate sufficient to pay the purchase price. To the extent the elements are the same, the Court incorporates any relevant findings from its § 523(a)(2)(A) analysis. Taking each in turn:

### *The Debtor's Representation That She had $999,500 in Cash to Purchase the Property*

This representation, if made, comes solely from the Debtor's act of signing the Contract. This Court finds that this representation was made in writing, and that it arguably relates to the Debtor's financial condition. Assuming also that this statement was materially false, the Court finds the Debtor had no intent to deceive the Jameses. As already described in the context of the other representations, the Jameses have failed to produce evidence creating an inference that the Debtor intended to deceive them. At most, the Debtor was careless in signing an all-cash contract based upon Knowles' representations that he would secure financing. Carelessness, however, does not rise to the level of reckless disregard. For this reason, this Court declines to find nondischargeability based on this representation.

62

### *The Debtor's Representation That She Was Approved by Tailwind Funding for $999,500*

Assuming this representation can be imputed to the Debtor, this Court finds that the requisite reasonable reliance is not present. The Contract's only mechanism for ensuring that the Debtor had available funds to close the cash sale was the proof of funds provision. It required that she provide "written verification from a depository of funds on deposit" within five days. Although the Jameses describe the Letter as a "proof of funds" representation, the Letter is from "Tailwind Funding, LLC," not a depository of funds.

The Letter also states that Tailwind is willing to "provide funding" on behalf of the Debtor; it does not state that the Debtor has funds available. The Letter also reserves the right to impose "loan conditions," a reservation not consistent with the cash terms of the Contract. Strong testified that the Letter did not raise any red flags, and Randy James testified to the same effect. This Court finds such testimony credible, but notes that reasonable reliance is an objective standard, and not a subjective one. The Jameses' actual reliance may suffice for the subjective justifiable reliance required under § 523(a)(2)(A), but does not suffice for the objective "reasonable reliance" required by § 523(a)(2)(B). For these reasons, the Jameses have failed to meet their burden to show reasonable reliance on the Letter.

### *The Debtor's Representation That She Had $989,500 Available from Banner Bank to Purchase the Property*

This representation suffers the same fatal flaw that it suffered under the Court's alternative analysis under § 523(a)(2)(A): there was no actual reliance, and thus there cannot be reasonable reliance. The evidence shows that both the Jameses and Strong knew the Check was a fake almost immediately and that they did not rely on it for that reason. Nondischargeability based on this representation is denied.

***The Debtor's Representation That She Had a Large Estate Sufficient to Pay the Purchase Price***

Assuming that the Debtor represented that she had a large estate or fund to purchase the Property, this statement is not actionable under § 523(a)(2)(B). Although this statement relates to the Debtor's financial condition, there is no evidence that the statement was ever made in writing. For this reason, the Jameses have not met their burden of proof based on this alleged representation.

### Conclusion as to Count II

In sum, on Count II, the Court concludes that the Jameses have failed to meet their burden of proof and that judgment should be entered in favor of the Debtor.

## Count III: § 523(a)(6)

The Jameses allege in a cursory manner that certain representations made by the Debtor or her agent were false and fraudulent and that they caused willful and malicious injury to the Jameses or their property. The Jameses rely on the same representations alleged in Count I, with the exception of the alleged representation regarding the possession date. In response to the Debtor's oral motion for judgment as a matter of law, the Jameses argued that the underlying debt is compensatory, and not sanction-based. In their closing, the Jameses argued that the Debtor's willfulness and maliciousness were evidenced by her acts of signing the Contract, sending the Letter, and sending the Check when she knew she did not have the funds to purchase the Property.   Based on the evidence, the Court disagrees.

Section 523(a)(6) provides in pertinent part that a "discharge under section 727. . . of this title does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity." To prevent discharge of a debt under § 523(a)(6), the movant must show by a preponderance of the evidence both elements: that

(1) the debt is for "willful injury," and (2) the debt is for "malicious injury." *In re Patch*, 526 F.3d 1176, 1180 (8th Cir. 2008). "Willful," as used in the statute, modifies the word "injury," so that nondischargeability requires a "deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). As with any exception to discharge, nondischargeability under § 523(a)(6) is to be strictly construed in accord with the fresh start aim of the Bankruptcy Code. *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 853 (8th Cir. 1997), *aff'd sub nom., Kawaauhau v. Geiger*, 523 U.S. 57 (1998).

The first requirement, that the injury is "willful," requires a "deliberate or intentional invasion of the legal rights of another." *Roussel v. Clear Sky Properties, LLC*, 829 F.3d 1043, 1047–48 (8th Cir. 2016) (citation omitted). More specifically, the injury must be an intentional tort, which requires that the tortfeasor "desire to cause consequences of his act" or "believes that the consequences are substantially certain to result from it." *Geiger*, 113 F.3d at 852 (citing RESTATEMENT (SECOND) OF TORTS § 8A at 15 (1965)); *see also Patch,* 526 F.3d at 1180.

The second requirement, that the injury is "malicious," requires conduct that is "targeted at the creditor . . . at least in the sense that the conduct is certain or almost certain to cause financial harm." *Roussel,* 829 F.3d at 1047 (citation omitted). "If the debtor's conduct was inexcusable and resulted in an inevitable injury to the plaintiff, it is malicious." *In re Jeffries*, 378 B.R. 248, 256 (Bankr. W.D. Mo. 2007) (citation omitted). As made clear after *Geiger*, conduct that is merely negligent or reckless is insufficient for nondischargeability under § 523(a)(6). *Geiger*, 523 U.S. at 64.

Section 523(a)(6) "sounds in tort, not breach of contract." *Jeffries*, 378 B.R. at 256 (citation omitted); *see also* 4 COLLIER ON BANKRUPTCY ¶ 523.12[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Section 523(a)(6) generally relates to torts and not to contracts.").

In *Geiger*, the Eighth Circuit was called upon to decide whether § 523(a)(6) requires a willful injury or "an intentional act that results in injury." The Court chose the former, and cited breach of contract as evidence that the latter approach proves too much. *Geiger*, 113 F.3d at 852 ("[W]e see no reason that a knowing breach of contract would not result in a judgment that would be exempt from discharge under this legal principle. Surely this proves too much."). The Supreme Court agreed, and compared a knowing breach of contract to an intentional vehicle maneuver that causes unforeseen injury – both would violate the maxim that exceptions to discharge should be narrowly construed. *Geiger*, 523 U.S. at 62.

Thus, as a general rule, debts resulting from breach of contract, even debts resulting from intentional breach of contract, are not excepted from discharge under § 523(a)(6). *In re Johnson*, Adv. No. 07-3115, 2007 WL 5065545, at *3 (Bankr. D. Minn. Nov. 14, 2007) (citing *In re Glatt*, 315 B.R. 501, 511 (Bankr. D.N.D. 2004)); *see also In re McDowell*, 299 B.R. 552, 555 (Bankr. N.D. Iowa 2003) ("Simple breach of contract . . . is not included in the limited exceptions to discharge in bankruptcy.").

### The Jameses Failed to Prove Willful Injury

Here, the Jameses have failed to prove willful injury. The Court rejects the Jameses' allegations that the Debtor caused willful injury by signing the Contract, sending the Letter, and sending the Check knowing that she did not have the funds on hand for either the purchase price or earnest money. As discussed above, there is no evidence the Debtor sent, or caused to be sent, the Letter or the Check. Although the law allows imputation of fraudulent acts or representations under § 523(a)(2), imputation of willful and malicious actions is not authorized by the plain language of § 523(a)(6). *See, e.g., In re Nolan*, 220 B.R. 727, 731–32 (Bankr. D.D.C. 1998)

("[T]he debtor must have been the one who caused the willful and malicious injury. Imputed liability is insufficient.") (citation omitted).

With respect to the Debtor's signing the Contract without having the funds on hand, the Court finds the Debtor credible in her assertion that she believed Knowles had the funding to consummate the transaction.  In addition, the Court believes it was the Debtor's intention to purchase the property to open a B&B, however dubious a business decision that may have been at the time. There is no evidence to support the Jameses' argument that the Debtor devised a scheme to get a free house, hoping the title company would somehow transfer the deed before receiving the funds. That theory is not supported by common sense, let alone the plain terms of the Contract.

The failed transaction was not a "deliberate or intentional invasion of the legal rights" of the Jameses. *Roussel*, 829 F.3d at 1047–48. Nor was it an intentional tort, where the Debtor "desire[d] to cause consequences of [her] act" or "believe[d] that the consequences [were] substantially certain to result from it." *Geiger*, 113 F.3d at 852. The Jameses failed to produce any evidence of the Debtor's intent to cause willful injury. To the contrary, the Debtor displayed genuine remorse for the transaction falling through. For these reasons, the Court finds the Jameses have failed to prove willful injury.

### *The Jameses Failed to Prove Malicious Injury*

The Jameses have also failed to prove malicious injury. The Court rejects the Jameses' allegations that not producing the money and sending the fake Letter and Check amount to malicious injury. Again, there is no evidence that the Debtor sent, or caused to be sent, the Letter or the Check.

The Court finds the Debtor credible in that she believed the funding was in place to purchase the Property. While the Debtor was naïve in her belief that Knowles had the funding to purchase the Property, conduct that is merely negligent or reckless is insufficient for nondischargeability under § 523(a)(6). *Geiger*, 523 U.S. at 64. Moreover, the Debtor did not target the Jameses "in the sense that [her] conduct [was] certain or almost certain to cause financial harm" to them. There is no evidence that the Debtor intentionally set out to cause the Jameses financial harm.

*Conclusion as to Count II*

For these reasons, the Court finds the Jameses have failed to prove willful and malicious injury. Judgment against the Jameses should be entered on Count III.

**The Debtor's Oral Motion Regarding Rule 7054 and § 523(d)**

In her closing argument, the Debtor for the first time requested that the Court reserve jurisdiction after any judgment under Fed. R. Civ. P. 54 as incorporated by Rule 7054 to allow her to request attorney fees and other costs under § 523(d). The Court denies the oral motion.

First, Fed. R. Civ. P. 54 does not create an independent basis to impose fees. Under the American Rule, each party bears its own attorney fees. Fed. R. Civ. P. 54(d)(2), however, allows the prevailing party to recover attorney fees where it is authorized by some independent basis. Here, the only independent basis the Debtor raised is § 523(d), which provides:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

The Court denies the Debtor's request for fees under this section, for several reasons.

First, the Debtor argues that § 523(d) applies when a creditor argues that a debt is consumer debt but loses on that argument. The Debtor's interpretation of § 523(d) is not supported by the plain language of the statute, which applies only when "a creditor requests a determination of dischargeability of a consumer debt." Since the debt here is not a consumer debt, § 523(d) does not apply.

Second, even if the Court is incorrect in its interpretation of § 523(d) (and the Debtor cited no authority one way or the other and the Court found none), the Court would nonetheless find that the Debtor is judicially estopped from arguing that the debt is a consumer debt; her consistent position throughout this case has been that the Jameses' debt was not a consumer debt, and to change her position now would prejudice the Jameses.

Third, the Court finds that the Jameses' complaint was substantially justified, as evidenced by the length of this opinion and the number and complexity of the legal and factual issues.

Fourth and finally, even if the debt is a consumer debt and the complaint was not substantially justified, this Court may still refuse to award attorney fees where special circumstances would make the award unjust. Courts are to make this determination by referencing equitable principles. *In re Dizinno*, 559 B.R. 400, 412 (Bankr. M.D. Pa. 2016). Here, the Debtor did not request fees in her answer, at any of the many status conferences, in her brief, or even in her opening statement. The first time she indicated she would be requesting reimbursement of her fees from the Jameses was in her motion for judgment and closing arguments.  To allow her to request fees at this late juncture prejudices the Jameses and would make an award of fees unjust.

**Conclusion**

In conclusion, judgment on each count of the adversary complaint and motion to dismiss or convert in the alternative is entered in favor of the Debtor and against the Jameses. The parties are to bear their own costs and attorney fees. A separate judgment will issue.


Dated: February 24, 2017                    /s/ Cynthia A. Norton
                                            United States Bankruptcy Judge

# Tailwind Funding, LLC

• PO BOX 100186, Milwaukee, WI 53210 •
• Phone: 1-866-600-9393 Fax: 1-888-611-8810 •

April 08, 2013

RE: Sharon West

To Whom It May Concern:

This letter is to confirm that Tailwind Funding, LLC is willing to provide funding for the requested purchase price to Sharon West in an amount up to $ 999,500.00 for the purchase of 24704 E. Haines Road Greenwood, Mo.. Funds are available to close on the subject property on behalf of Sharon West. Funding is subject to our complete review of the transaction and Tailwind Funding, LLC reserves the right to amend or add any requirements or loan conditions as it chooses in its sole discretion.

Please feel free to contact us if you have any questions or need any additional information.

Kind Regards,

*Brian J. Meidam*

Brian J. Meidam
Funding Manager

West
EXHIBIT NO. 5
NG 05046
METROPOLITAN
COURT REPORTING & LEGAL VIDEO

CLERK U.S. BANKRUPTCY COURT
Exhibits:
P    26    D
Case No. 16-40358

JS2